## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Bankruptcy No. 16 B 09913 |
| WTE-S&S AG ENTERPRISES, LLC, | ) | Chapter 11 |
| | ) | Judge Donald R. Cassling |
| Debtor. | ) | |
| ——————————————— | ) | |
| WTE-S&S AG ENTERPRISES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 16 A 00400 |
| | ) | |
| GHD, INC. n/k/a DVO, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Debtor has sued defendant for breach of a contract to design and construct a "cow-manure digester." A cow-manure digester is a "green-energy" technology used on dairy farms to convert cattle waste into four economically valuable products: (1) methane and other biogases used to fuel an electricity generating machine, otherwise known as a "gen-set"; (2) the electricity generated thereby, which can either be used by the digester owner in helping to operate the digester or sold to the local power company; (3) liquid waste, which can be used as fertilizer by the farmer for the crops that he uses to feed his cattle; and (4) dried and biologically "clean" solids that can be used as sanitary and comfortable bedding for the farmer's cattle, thereby improving milk production and minimizing certain types of sores and other physical ailments that afflict dairy cows when using other types of bedding. Because the government wishes to encourage the use of green technologies, a fifth economic benefit of the digester is the generous subsidy that the government provides to companies using approved green technologies.

Anaerobic bacteria are the agents that break down cow manure into its constituent parts of biogas, liquid waste, and clean solids. Those bacteria require precise control of temperatures, pressures, and waste circulation in order to do their job. Those precise parameters can only be maintained if the digester has been properly designed and constructed.

Plaintiff, the Debtor herein, is the owner of the digester, a concrete vessel as large as a football field, together with related buildings and machinery located on a dairy farm in rural Wisconsin. Debtor has sued the designer and builder of the digester, claiming that the digester was improperly designed and constructed, depriving the plaintiff of the expected economic benefits of the digester and ultimately driving it into bankruptcy. Debtor therefore sued defendant, DVO, Inc.,[1] for breach of contract in Wisconsin state court, later removing that lawsuit to Bankruptcy Court.

The Court held an eight-day trial on the complaint, which concluded on March 2, 2017. The parties submitted proposed findings of fact and conclusions of law on April 7, 2017. For the reasons stated below, the Court rules partially in favor of Debtor, awarding damages in the sum of $65,961.86.

## I.    JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code. 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under title 11 of the United States Code, or arising in or related to cases under title 11. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with 28 U.S.C. § 157(a), the District Court for the Northern District of Illinois has

---

[1] DVO, Inc. was GHD, Inc. GHD changed its name to DVO in an effort to avoid confusion with another company. (Trial Tr. Vol. 4, 114:13-16.)

referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under title 11.  28 U.S.C. § 157(b)(1).  Section 157(b)(2) contains a non-exhaustive list of "core proceedings" in which the bankruptcy court may enter a final order or judgment.  28 U.S.C. § 157(b)(2).  By contrast, when the bankruptcy court has jurisdiction over a matter only because it is in some way "related to" the bankruptcy case, the court may not enter final judgment, but may only enter proposed findings of fact and conclusions of law.  28 U.S.C. § 157(c)(1).  The proceedings in this latter category are known as "non-core" proceedings.  Notwithstanding the provisions of § 157(c)(1), the Court can enter a final order in non-core proceedings with the consent of the parties.  28 U.S.C. § 157(c)(2); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015).

The complaint asserts a breach of contract claim against DVO under Wisconsin law.  This claim neither arises under the Bankruptcy Code nor in a case under the Bankruptcy Code. Nonetheless, it "affects the amount of property available for distribution or the allocation of property among creditors" and is therefore sufficient to establish "related to" jurisdiction. *Elscint, Inc. v. First Wis. Fin. Corp. (In re Xonics, Inc.)*, 813 F.2d 127, 131 (7th Cir. 1987); *see Chapman v. Charles Schwab & Co. (In re Chapman)*, 269 B.R. 201, 206 (Bankr. N.D. Ill. 2001) ("[S]tate law claims that merely impact the distribution to creditors are 'related' noncore proceedings.") Therefore, the Court will treat the breach of contract claim as non-core.

Following the trial, the Court asked the parties to declare whether they would consent to this Court adjudicating the non-core claim in this adversary proceeding.  Both parties gave their consent.  (Tr. Vol. 7, 187:6-190:14.)  As a result, the Court's findings of facts and conclusions of

law constitute a final judgment on the merits.

## II.   PROCEDURAL HISTORY

On June 15, 2016, Debtor filed a notice to remove the litigation between it and DVO from the Circuit Court of Door County, Wisconsin to the United States Bankruptcy Court for the Eastern District of Wisconsin. (Dkt. No. 2, pp. 1-6.) On July 5, 2016, Debtor and DVO filed a stipulation to transfer the litigation to the United States Bankruptcy Court for the Northern District of Illinois. (*Id.* at pp. 95-98.) That same day, the Wisconsin Bankruptcy Court approved the transfer. (*Id.* at p. 99.)

## III.   BACKGROUND

### A.   Parties

### 1.   Debtor and Related Parties

Debtor is a Wisconsin limited liability company formed in October of 2010. (Debtor Ex. No. 3). It owns the anaerobic digester system (the "Digester") located at S&S Ag Farm, 7900 Old Elm Road in Sturgeon Bay, Wisconsin (the "Farm").[2] (Trial Tr. Vol. 1, 71:9-15.)[3] The sole member of Debtor is Sustainable Venture Partners, Energy Partners I, LLC ("SVP"), a limited liability company formed for the express purpose of investing in the Digester. (*Id.* at 72:1-14.) Jamie Philip is the managing partner of SVP, while Stephen Philip and Greg Crowther are the other partners. (*Id.* at 72:15-18; 74:9-21.)

---

[2] Randy Schmidt owns and is the general manager of the Farm. (Schmidt Dep. 9:1-7.)
[3] All references to the trial transcript will be as follows: "Tr. Vol. []."

## 2. Defendant and Related Parties

Defendant, DVO, Inc., designs and installs anaerobic digesters and has constructed more than one hundred digesters throughout the world. (Tr. Vol. 4, 115:9-14.) Steve Dvorak and his wife Melanie are the owners of DVO. (*Id.* at 51:7-19; 52:4.)

Corey Brickl is the general manager of DVO. (Tr. Vol. 3, 191:19-22.) He provides initial engineering estimates for the projects designed and built by DVO. (Tr. Vol. 5, 34:24-35:6.) He also works with other DVO employees to help ensure that actual construction is implemented in accordance with the design. (*Id.*) Adam Nackers is the project manager for DVO. (Tr. Vol. 3, 191:15-16; Tr. Vol. 4, 268:5-6.) As project manager, he oversees the installation of DVO's anaerobic digester systems, serves as the customer's primary point of contact during the construction process, interacts with contractors, and performs site inspections. (Tr. Vol. 4, 268:14-24.) Bradd Seegers is a project administrator for DVO. (Tr. Vol. 6, 197:5-7.) He prepares all of the grant applications to receive federal subsidies and manages the grant process. (*Id.* at 129:4-10.)

## 3. How Does the Digester Operate?

Chad Olsen,[4] one of Debtor's expert witnesses, testified that an agricultural anaerobic digester system is designed to take manure produced at a dairy farm, and run it through a digester, where it is broken down into biogases, solid wastes and liquid wastes. (Tr. Vol. 3, 42:20-43:2.)

Farm workers collect the manure and funnel it into a reception pit, from which it flows into the Digester. (*Id.* at 61:24-62:11.) Once inside the Digester vessel, a combination of heat and

---

[4] Chad Olsen is the vice president of the wastewater group for McMahon Engineering. (Tr. Vol. 3, 30:6-22.) His job is to oversee the wastewater group of McMahon Engineering, as well as to plan, design, and construct wastewater and bio-energy facilities. (*Id.* at 31:7-11.) Olsen has worked on roughly twenty-four different anaerobic digesters throughout his career. (*Id.* at 34:8-11.) The Court accepted Olsen as an expert witness under Federal Rule of Evidence 702 in order to provide his expert opinion on the design and engineering of the Digester. (*Id.* at 59:25-60:11).

bacteria break down the waste over a 20-30 day period, in the process producing methane and other biogases.  (*Id.* at 47:6-23.)  Steve Dvorak testified that the fermentation process in the Digester vessel heats the waste to 101-103 degrees Fahrenheit.  (Tr. Vol. 4, 84:3-19.)

The biogas produced during fermentation rises into the headspace of the Digester, which is the space between the liquid waste in the digester and the roof of the Digester.  (Tr. Vol. 3, 65:6-12.)  From there, the biogas flows into pipes set into the Digester, where it is then directed to the gen-set to produce electricity.[5]  (*Id.* at 65:13-15.)  The biogas produced from this process is sixty-sixty-five percent methane, the primary fuel used by the gen-set.  (*Id.* at 62:12-24.)

There are different types of design for a digester.  The Digester here is a two-stage plug-flow anaerobic digester system.[6]  (*Id.* at 46:14-47:2.)  It consists of a rectangular vessel containing five separate chambers or zones to control the heat, pressure and mixing of the manure.  (*Id.* at 114:9-19.)  If the Digester produces excess biogas or the gen-set is not running, a flare burns the excess biogas, preventing it from escaping into the atmosphere.  (*Id.* at 65:18-66:1.)

The waste mixture which remains at the end of the digestion process flows into the final chambers.  These are dewatering units where the fermented manure is separated into solids and liquids.  (*Id.* at 69:25-70:7.)  After the solids have been separated out by pressing them with hydraulic gears, they are blown into piles to be picked up by the farmer for use as cow bedding.  The remaining liquid flows into the effluent side of the reception pit and, from there, runs into a nearby lagoon, where it is available to the farmer for use as fertilizer.  (*Id.* at 70:19-72:11.)

**B.**     **How Does the Digester Make Money for its Owner?**

The Digester directly generates revenue for the Debtor in two ways:  First, Debtor has an

---

[5] A gen-set is made up of a generator and an engine.  (Tr. Vol. 5, 199:17-19.)

[6] Another type of digester is the complete mix system.  (Tr. Vol. 3, 48:11-22.)

interconnection agreement and a power purchase agreement with Wisconsin Public Service Corporation ("WPS"), the state's electrical utility company. (Debtor Ex. No. 16.)  Under the interconnection agreement, Debtor agrees to convert biogas to renewable energy and to export the renewable energy to WPS. (Tr. Vol. 2, 26:19-24).  In entering into this arrangement, WPS fulfills part of its regulatory obligations to participate in the production of a certain amount of renewable energy. (*Id.*)  The power purchase agreement sets forth the rates that WPS will pay to Debtor. (*Id.* at 25:15-22.)  Debtor's other direct source of revenue comes in the form of carbon credits.  Carbon credits are like currency, in that they are awarded regularly in exchange for destroying methane, a harmful greenhouse gas. (*Id.* at 27:7-17.)  Debtor receives these carbon credits under a contract it has with Camco Offsets 1, LLC, a company which commercializes carbon credits. (*Id.* at 27:25-28:20; Debtor Ex. No. 17.)[7]

In addition to direct revenue, the Digester also provides additional economic benefits to Debtor by lowering its operating costs.  For example, although the Farm does not pay money to Debtor for the liquid fertilizer and dry cattle bedding it receives from the Digester, it "pays" for those products by devoting a significant portion of its land for the site of the Digester and its related buildings and lagoons and by providing the cow manure used in the Digester.  Finally, a portion of the electricity generated by the gen-set is used to provide power to the Digester and its machinery and equipment.  All three of these economic benefits help improve Debtor's bottom line by lowering its operating costs.

### C.    Initial Meeting of the Parties

In 2007, farmer Randy Schmidt approached DVO owner Steve Dvorak about the prospect of installing an anaerobic digester system at the Farm. (Tr. Vol. 4, 116:21-117:5.)  Schmidt's

---

[7] No evidence was presented at trial to clarify (a) what entity awards the carbon credits and (b) how those credits are converted by Debtor into cash.

original suggestion was to have the Farm itself become the owner and operator of the Digester. (Schmidt Dep., 15:9-15.)

Although the Dvoraks had been designing anaerobic digesters for many years, they began to consider investing in such projects only after the federal government instituted its Section 1603 Treasury Grant Program (the "Section 1603 Grant") in late 2009. Under that program, the government agreed to reimburse up to thirty percent of eligible costs for projects like the anaerobic digester system. (Tr. Vol. 4, 129:7-130:3.)

On June 29, 2010, DVO applied for a Section 1603 Grant by submitting a "Large Project Grant Application" for the Digester being proposed for the Farm. DVO made the application on behalf of Door County Environmental Energy LLC, a company owned by Schmidt. (Tr. Vol. 3, 208:7-16; Debtor Ex. No. 23.) The application described the project as an "anaerobic digester system" and identified DVO as the "installation contractor." (Debtor Ex. No. 23.)

Unfortunately, the dairy industry suffered a recession in 2009 and DVO's project with Schmidt never materialized. (Tr. Vol. 4, 127:9-129:13.) Once this original project ground to a halt, DVO employee, Corey Brickl, began soliciting potential investors to fund the Digester at the Farm. (Tr. Vol. 5, 161:17-25.) One of those potential investors was Jamie Philip of SVP. (*Id.* at 163:20-22.) Although inexperienced in the construction and operation of anaerobic digester systems, he was interested in making "green-energy" investments and began looking into anaerobic digester projects as a means of accomplishing that goal. (Tr. Vol. 1, 75:15-76:4.)

Philip first met with DVO owner Steve Dvorak in 2009. (*Id.* at 76:21-77:9.) At the initial meeting, they discussed digester systems, potential profits derived from owning a digester system, the state of the farming industry, and the prospect of getting outside investors involved in constructing and operating anaerobic digesters. (*Id.* at 77:10-16.) Philip followed up his initial

meeting with Dvorak with a trip to Washington, D.C. to meet with representatives of the United States Department of Agriculture and the Environmental Protection Agency to learn about the support network around anaerobic digesters. (*Id.* at 84:11-18.) His brother joined him. (*Id.*)

DVO sent the Philip brothers documentation regarding potential investment opportunities for a digester to be built on one of four different farms in Wisconsin. (*Id.* at 85:19-86:4; 88:4-22; Debtor Ex. No. 15.) One of these farms was the Farm owned by Schmidt. DVO's documentation included projected revenue statements, build budgets, and cash flow projections. (Tr. Vol. 1, 83:17-84:1; 86:9-23; Debtor Ex. No. 15.) Philip testified that it was his understanding that SVP would provide capital for the project, and that DVO, with its experience in the field, would build the Digester using SVP's funding. (Tr. Vol. 1, 91:24-92:6; 96:15-23.)

The DVO budget and revenue projections were prepared by DVO employee Brickl, together with DVO owner Steve Dvorak and his daughter, Melanie VanOrnum. (*Id.* at 94:6-13.) Brickl prepared build budgets and revenue projections for each of the four proposed digester projects. (Tr. Vol. 3, 254:5-15.) Philip understood the project budget to be the "project cost, soup to nuts," and the final price reflected "what it would cost to bring this to life and generate energy, generate revenue[.]" (Tr. Vol. 1, 94:17-24.)

Each project budget Philip received from DVO assumed that DVO would receive a flat development fee of $400,000. (*Id.* at 144:3-12;[8] DVO Ex. No. 88.) Philip was involved in ten to twenty meetings with Brickl, Dvorak, or VanOrnum regarding project budgets or grant money. (Tr. Vol. 1, 94:1-16.) During each meeting, the parties engaged in detailed discussions regarding the project costs. (*Id.* at 94:1-24.) In mid-2010, Crowther joined Philip as a partner in the projected investment. (*Id.* at 95:8-16.)

---

[8] The transcript incorrectly references SVP as the recipient of that fee.

SVP initially planned to raise between three and four million dollars, the investment amount contemplated by each of the project budgets prepared by DVO. (*Id.* at 97:8-17.) Ultimately, however, SVP was only able to raise $1.7 million from investors. (*Id.* at 97:18-98:1.) Rather than lose the entire project due to inadequate funding, Steve Dvorak offered to pledge the additional funds and partner with SVP to proceed with the development of the Digester. (*Id.* at 98:2-7.)

### D.     Creation of Debtor

In September and October of 2010, while discussions with SVP were ongoing, Steve and Melanie Dvorak formed both WTE, LLC and Debtor as investment vehicles for digester projects. (Tr. Vol. 4, 14:3-5; 15:20-16:5; Debtor Ex. No. 3.) Debtor was to provide the funding for the particular digester to be built on the Farm, while WTE, LLC would fund other biomass projects and act as the parent company to Debtor. (Tr. Vol. 4, 14-16.)

On October 7, 2010, Steve Dvorak on behalf of Debtor executed a letter of intent with the Farm (the "LOI"). (*Id.* at 130:16-131:19; DVO Ex. No. 166.) At that time, SVP was still considering whether to partner with Debtor in the investment. (Tr. Vol. 6, 236:4-9.) SVP had no input on the LOI. (*Id.* at 235:14-236:2.) The LOI stipulated that the Farm would supply the manure to Debtor for treatment. (DVO Ex. No. 166.) Debtor would treat the waste and get the biogas from the Digester to sell to WPS and to generate carbon credits. (Tr. Vol. 4, 132:4-133:4.)

### E.     Execution of the Digester Contract

On November 10, 2010, Debtor and DVO, both then owned by the Dvoraks, executed a contract (the "Digester Contract") for the design and building of the Digester. (Tr. Vol. 1, 125:6-22.) The Digester Contract consists of two documents:  the "Standard Form of Agreement Between Owner and Design/Builder on the Basis of a Stipulated Price" (the "SFOA"), and the

"Standard General Conditions of the Contract Between Owner and Design/Builder" (the "General Conditions"). (Debtor Ex. Nos. 1 & 2.) Debtor is the owner and DVO is the Design/Builder under the Digester Contract. (Debtor Ex. No. 1, p. 3.)

The Digester Contract is a "design/build" contract and is in a form approved by the Engineers Joint Contract Documents Committee. Both parties agree that the Digester Contract is a single-source-responsibility contract in which the design/builder takes on responsibility for both designing and building the project. (Tr. Vol. 3, 54:1-10; Tr. Vol. 4, 236:17-19.) On November 10, 2010, when Melanie Dvorak signed the SFOA, she and Steve Dvorak – the president of DVO – were the only members of DVO as well as the only members of Debtor through WTE, LLC. (Tr. Vol. 4, 136:20-23.) SVP did not participate in the negotiation, proposal, or acceptance of the Digester Contract between Debtor and DVO. (Tr. Vol. 1, 122:22-25.)

**F.      Beginning Construction of the Digester**

Shortly after execution of the Digester Contract, Steve Dvorak instructed DVO to obtain bids from subcontractors whose work he knew from prior construction projects. (Tr. Vol. 4, 144:8-25.) Construction of the Digester at the Farm (the "Project") began in November of 2010. (*Id.* at 147:13-148:1.)

By December 1, 2010, SVP had decided to partner with WTE, LLC, and Philip and Crowther began spending time at the Farm to oversee and observe the Project. (Tr. Vol. 1, 142:13-143:9.) Although no formal operating agreement between WTE, LLC and SVP had yet been executed (*id.*), one or the other of them "came to be on the [Farm] every day almost, Monday through Friday" from December 2010 through at least May 2012. (Tr. Vol. 2, 311:23-12:10.) During this time, DVO employee Adam Nackers was on site on a regular basis as required by the Digester Contract. (Tr. Vol. 1, 145:18-146:8.)

11

### G.    Execution of the Operating Agreement

During the same time period, WTE, LLC and SVP formally agreed to join forces to construct and operate a digester.  Following the selection of the Farm as the site for the Digester, the parties began to negotiate the terms of an operating agreement setting forth the parameters for Debtor's operation of the Digester under the joint control of SVP and WTE, LLC (the "Operating Agreement").  (Debtor Ex. No. 4.)  Debtor, SVP, and WTE, LLC were the parties to the Operating Agreement.  (*Id.*)

The parties executed the Operating Agreement sometime in January of 2011.  (Tr. Vol. 1, 113:19-115:13.)  The Operating Agreement required SVP to provide fifty-seven percent of the capital contributions, with WTE, LLC to provide the remaining forty-three percent funding.  (*Id.* at 116:3-117:8.)  The Operating Agreement additionally obligated SVP to invest the first $1,700,000 before WTE, LLC would be obligated to invest its $1,720,205, after which SVP would invest the last $600,000.  (*Id.* at 121:24-122:7; Debtor Ex. No. 4, p. 34 (Exhibit A).)

The total capital contribution of $4,020,205 set forth in the Operating Agreement reflected a build budget of $3,820,205 plus $200,000 to enlarge the gen-set to provide more electricity than the amount provided for in its original design.  (Tr. Vol. 1, 117:9-23; *see* Debtor Ex. No. 4, p. 10.)

### H.    WTE, LLC Withdraws Pledge to Partially Fund the Digester

In early March 2011, Steve and Melanie Dvorak told Philip that they no longer wanted to partner with SVP, and WTE, LLC was therefore not going to fund its $1,720,205 as required by the Operating Agreement.  (Tr. Vol. 1, 168:8-169:12.)

WTE LLC's decision to withdraw its pledge of a $1.7 million capital contribution halted construction of the Digester.  (*Id.* at 173:4-12.)  Ultimately, SVP decided to go forward on its own with the Project and obtained a bank loan to redeem WTE LLC's interest in Debtor, which also

meant that SVP would assume WTE LLC's obligation to fund the rest of the construction. (*Id.* at 175:6-10.) State Bank of Chilton provided the loan to SVP. (*Id.* at 178:24-179-8.) Steve Dvorak is on the board of the State Bank of Chilton. (Tr. Vol. 3, 187:1-3.) Debtor, SVP, and WTE, LLC executed a redemption agreement in October 2011 (the "Redemption Agreement") giving SVP sole ownership of Debtor. (Tr. Vol. 1, 175:11-176:11; Debtor Ex. No. 8.)

DVO was a signatory to the Redemption Agreement, because DVO insisted that the Digester Contract remain in place. (Tr. Vol. 1, 177:1-12.) Steve Dvorak negotiated the Redemption Agreement on behalf of DVO and signed the Redemption Agreement in his capacity as the principal of DVO, a member of WTE LLC, and a member and manager of Debtor. (*Id.* at 177:13-25; Debtor Ex. No. 8, p. 6.) DVO continued to bill Debtor for the work that it was doing throughout 2011. Construction of the Digester resumed in July or August of 2011. (Tr. Vol. 2, 5:21-24.)

## I.    Completion of the Digester

On January 20, 2012, Nackers, the DVO project manager, sent a letter to Dean Sylla of the United States Department of Agriculture, Natural Resources Conservation Service (the "NRCS") indicating that construction of the Digester was complete, and the "[D]igester and all of its components were built in accordance with NRCS approved plans" (the "Completion Notice"). (Debtor Ex. No. 10.) The Completion Notice attached the stamped as-built plans for the Digester. (*Id.* at pp. 2-26.) Although Nackers sent a copy of the Completion Notice to Greg Crowther of Debtor at the same time it was sent to the NRCS, Nackers did not review or discuss the Completion Notice with SVP before sending it to the NRCS. (Tr. Vol. 2, 8:25-9:6; 13:8-14:3; Debtor Ex. No. 10, p. 1.)

On January 20, 2012, WPS authorized Debtor to operate its 1-megawatt generating facility located at the Farm via a letter referencing "Permission to Operate Generation Facility." (Tr. Vol. 2, 337:1-5; Debtor Ex. No. 16.)

On April 20, 2012, Stephen Philip signed a "Project Completion Notice" on behalf of Debtor. (DVO Ex. No. 98.) This document was signed under penalty of perjury, submitted as part of Debtor's "Focus on Energy" grant application, and certified a "Completion Date" of January 20, 2012. (*Id.*; Tr. Vol. 6, 118.)

**J.    Debtor's Punch List and Deductive Change Orders**

Ten months after the certified Completion Date, Debtor submitted a punch list of items remaining to be fixed or completed (the "Punch List") to DVO on November 7, 2012. (Debtor Ex. No. 35; Tr. Vol. 5, 136:9-137:15.) Submission of a Punch List is contemplated by section 13.05 of the General Conditions and allows Debtor to ask for corrections of construction errors from DVO. (Debtor Ex. No. 2; Tr. Vol. 2, 31:8-11.) The Punch List was prepared by Philip and Crowther, who based it on firsthand observations at the site. (Tr. Vol. 2, 30:21-31:2.) The Punch List did not reflect a complete list of issues relating to the Digester. (*Id.* at 34:1-4.)

After submitting the Punch List, Philip continued to try to identify additional errors in the construction and design of the Digester. (*Id.* at 34:15-23.) On January 17, 2013, Philip and Crowther listed these additional items in a "Deductive Change Order" that is referenced at the bottom of the Punch List (the "First Deductive Change Order"). (*Id.* at 36:11-15; Debtor Ex. No. 36.) Philip calculated his repair estimates on the First Deductive Change Order by using actual invoices or invoiced amounts for actual replacement costs. (Tr. Vol. 2, 39:9-15.) When Debtor issued the First Deductive Change Order, it was still not a complete list of alleged construction or design errors, because Debtor was continuing to work on identifying additional errors. (*Id.* at

38:23-39:2.)

Debtor sent a revised deductive change order (the "Second Deductive Change Order") to DVO on or about July 30, 2013. (*Id.* at 39:18-40:23; Debtor Ex. No. 37.) Philip and Crowther prepared this document. (Tr. Vol. 2, 41:8-9.) The Second Deductive Change Order generally represents Debtor's total estimate of its damages that it claims resulted from DVO's breach of the Digester Contract. (*Id.* at 41:20-22.)

## IV.   DISCUSSION

### A.   Applicable Law for Breach of Contract

Section 16.05 of the General Conditions states that the "Contract Documents will be construed in accordance with the law of the place of the Project." (Debtor Ex. No. 2, p. 32.) Because the Digester is located on the Farm, Wisconsin law governs the Digester Contract.

Under Wisconsin law, a breach of contract claim has three elements: (1) a valid contract; (2) a violation or breach of the terms of that contract; and (3) damages that flow from the breach. *Matthews v. Wis. Energy Corp.*, 534 F.3d 547, 553 (7th Cir. 2008) (citing *NW. Motor Car, Inc. v. Pope*, 187 N.W.2d 200 (Wis. 1971)); *N. Am. Mech., Inc. v. Walsh Constr. Co. II, LLC*, 132 F. Supp. 3d 1064, 1071 (E.D. Wis. 2015) (quoting *Matthews*).

DVO does not dispute that the Digester Contract is a valid contract. The issues are whether Debtor sustained its burden to prove by a preponderance of the evidence that DVO breached the Digester Contract and that Debtor suffered damages as a result.

When Wisconsin courts must interpret a contract, the ultimate objective is to ascertain the intent of the parties. *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 866 N.W.2d 679, 685 (Wis. 2015); *MS Real Estate Holdings, LLC v. Donald P. Fox Family Tr.*, 864 N.W.2d 83, 94 (Wis. 2015). "Contract language is construed according to its plain or ordinary meaning, consistent with

what a reasonable person would understand the words to mean under the circumstances." *Tufail v. Midwest Hosp., LLC*, 833 N.W.2d 586, 592 (Wis. 2013) (internal quotation and citation omitted). The general rule regarding construction of contracts is that courts are to construe the meaning of particular provisions in the context of the entire contract as a whole. *MS Real Estate*, 864 N.W.2d at 94; *AVL Powertrain Eng'g, Inc. v. Fairbanks Morse Engine*, 178 F. Supp. 3d 765, 780 (W.D. Wis. 2016).

When the terms of a contract are clear and unambiguous, Wisconsin courts construe the contract according to its literal terms. *Parsons v. Associated Banc-Corp.*, 893 N.W.2d 212, 222 (Wis. 2017); *MS Real Estate*, 864 N.W.2d at 94. Thus, if the words of a contract are unambiguous, the parties' intent is presumed to be evidenced by the words of the contract. *Ash Park*, 866 N.W.2d at 685.

"'However, where contractual language is reasonably susceptible to more than one meaning, that language is ambiguous.'" *MS Real Estate*, 864 N.W.2d at 94 (quoting *Nature Conservancy of Wis., Inc. v. Altnau*, 756 N.W.2d 641, 644 (Wis. Ct. App. 2008)). If the terms of a contract are ambiguous, evidence extrinsic to the contract may be used to determine the parties' intent. *Tufail*, 833 N.W.2d at 592. "Admissible extrinsic evidence might include 'the surrounding circumstances including factors occurring before and after the signing of an agreement.'" *Kernz v. J.L. French Corp.*, 667 N.W.2d 751, 755-56 (Wis. Ct. App. 2003) (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Mussallem*, 289 N.W.2d 801, 808 (Wis. 1980)).

If a court decides that a contract is ambiguous and its consideration of the extrinsic evidence does not resolve the ambiguity, the court should construe the contract against the drafter. *Wells Fargo Bus. Credit v. Hindman*, 734 F.3d 657, 671-72 (7th Cir. 2013) (citing Wisconsin law). This tenet "is particularly true where a substantial disparity of bargaining power exists between

the parties or a standard form is supplied by the drafting party." *Gordon v. Hostak, Henzl & Bichler, S.C.*, 577 N.W.2d 617, 623 (Wis. 1998).

"It is not the function of the court to relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated." *Ash Park*, 866 N.W.2d at 686.

> i.     *Law of the Case*

The Wisconsin court previously determined a number of legal and factual issues in the case then before it, which this Court has accepted as law of the case. The law of the case as thus established includes the following facts and conclusions:

1. DVO did not act as the general contractor for the construction of the entire Digester. (Mot. in Limine Oral Ruling Tr. 15:11-19, Jan. 10, 2017.)

2. DVO and D&D are separate entities and there is no "alter-ego" relationship between the two entities. (*Id.* at 14:18-15:10.)

3. Debtor is barred from asserting any claim arising from: (1) allegedly defective or noncompliant wall ties in the Digester; (2) a purported violation by DVO of an engineering ethics code or an alleged kickback to DVO from a vendor; (3) materials or equipment supplied by DVO that extend beyond one year from the date of startup. (*Id.* at 27:3-16.)

> ii.     *Damages*

Wisconsin law entitles a party aggrieved by a breach of contract to a remedy that will restore it to the position it would have occupied had the breacher's promises been fulfilled. *McCormick v. Indep. Life & Annuity Co.*, 794 F.3d 817, 818-19 (7th Cir. 2015) (citing *Thorp Sales Corp. v. Gyuro Grading Co.*, 331 N.W.2d 342 (Wis. 1983)); *AVL Powertrain Eng'g*, 178 F. Supp.3d at 777. Under this concept, the injured party is entitled to damages that "flow directly and necessarily from the breach of contract, and that were reasonably foreseeable to or contemplated by the parties at the time the contract was made." *Int'l Prod. Specialists, Inc. v.*

*Schwing Am., Inc.*, 580 F.3d 587, 598 (7th Cir. 2009) (citing *Peterson v. Cornerstone Prop. Dev.,*

*LLC*, 720 N.W.2d 716, 730 (Wis. Ct. App. 2006)).

   Both compensatory and consequential damages are recoverable for breach of contract.

*Sentry Ins. v. Novelty, Inc.*, No. 09-cv-355-slc., 2009 WL 5087688, at *4 (W.D. Wis. Dec. 17,

2009). "Compensatory damages represent the actual harm inflicted on the plaintiff." *Trinity*

*Evangelical Lutheran Church & Sch.-Freistadt v. Tower Ins. Co.*, 661 N.W.2d 789, 802 (Wis.

2003). As the Wisconsin Supreme Court has noted:

> contract damages are compensatory; their purpose is to compensate the injured
> party for losses necessarily and foreseeably flowing from the breach, but the
> damaged party is not entitled to be placed in a better position because of a damage
> award than he or she would have been had the contract been performed.

*Pleasure Time, Inc. v. Kuss*, 254 N.W.2d 463, 469 (Wis. 1977).

   "Damages must be proven with reasonable certainty." *Designer Direct, Inc. v. DeForest*

*Redevelopment Auth.*, 368 F.3d 751, 752 (7th Cir. 2004) (citing Wisconsin law). "In Wisconsin a

claimant cannot recover for speculative or conjectural damages." *Sopha v. Owens-Corning*

*Fiberglas Corp.*, 601 N.W.2d 627, 634 (Wis. 1999). "To warrant damages, the evidence must

demonstrate that the injured party has sustained some injury and must establish sufficient data

from which the trial court . . . could properly estimate the amount." *Plywood Oshkosh, Inc. v.*

*Van's Realty & Constr. of Appleton, Inc.*, 257 N.W.2d 847, 849 (Wis. 1977). The aggrieved party

"generally has the burden of proving by credible evidence to a reasonable certainty [its] damage,

and the amount thereof must be established at least to a reasonable certainty." *Id.* "However, there

is no absolute requirement of mathematical precision. . . ." *Cutler Cranberry Co. v. Oakdale Elec.*

*Coop.*, 254 N.W.2d 234, 240 (Wis. 1977). The uncertainty which could prevent a recovery "is

uncertainty as to the fact of the damage and not to its amount. . . ." *Id.* Further, "where it is certain

that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery.

*Id.* The rule that recovery of a reasonable amount of damages will be allowed even though proof of actual damages was uncertain, however, does not apply when the damages are capable of exact and accurate proof. *Plywood Oshkosh*, 257 N.W.2d at 850.

There are three ways to measure damages occasioned by injury to property: (1) the cost of repair to the property; (2) the cost to restore the property; and (3) the diminished value of the property (i.e. the hypothetical value of the property without the defect, minus the actual value of the current property with the defect). *Champion Cos. of Wis., Inc. v. Stafford Dev., LLC*, 794 N.W.2d 916, 919 (Wis. Ct. App. 2010). If the cost-of-repair/restoration approach and the diminished-property-value approach result in different damage estimates, the court shall award the smaller of the two. *Laska v. Steinpreis*, 231 N.W.2d 196, 200 (Wis. 1975).

The Supreme Court of Wisconsin explained that

> [g]enerally, the measure of damages is the cost of correcting the defect . . . and with this money, the aggrieved party can specifically correct the defects . . . . This measure of damages is practical and attains the desired result only when the correction or completion does not involve unreasonable destruction of the work done so that the cost of corrections is not materially disproportionate to the value of the corrections. If reconstruction and completion in accordance with the contract involves unreasonable economic waste, then the rule as to those defects at least is the difference between the value the building would have had if properly constructed and the value that the building does have as constructed.

*W.G. Slugg Seed & Fertilizer, Inc. v. Paulsen Lumber, Inc.*, 214 N.W.2d 413, 416 (Wis. 1974).

Courts will conclude that repairs result in "economic waste" when they either result in "unreasonable destruction of the work done" or the cost of the repairs is "materially disproportionate to the value of the corrections." *Id.* If the proposed repairs would result in economic waste, damages should be measured by the difference between the value the property would have had if properly constructed and the value that the property does have as constructed. *Id.* The Supreme Court of Wisconsin acknowledged the difficulty of applying this rule:

> The only difficulty arises in the application of the rule to the facts of the particular

19

case. Whether the facts in a particular controversy justify the application of the rule of damages permitting recovery for the amount of the reasonable expense of remedying the defects, or whether the facts are such as to require the application of the "diminished value" rule, or whether the facts in a given case require the application of both branches of the rule of damages, to different items of dispute, is ordinarily a question to be determined by the trial court from all of the facts and circumstances in the particular case, subject always, however, to a review by this court. No hard and fast rules can be laid down as to whether in a given case the first branch of the rule or the second branch of the rule shall be applied.

*J.G. Jansen, Inc., v. Rilling*, 232 N.W. 887, 889 (Wis. 1930). Whether a defect should fall under the diminished value rule or cost of repair rule depends upon the nature and magnitude of the defect. *Plante v. Jacobs*, 103 N.W.2d 296, 299 (Wis. 1960). Evidence is sufficient if it enables the trier of fact to make a fair and reasonable approximation. *Thorp Sales Corp. v. Gyuro Grading Co.*, 319 N.W.2d 879, 884 (Wis. Ct. App. 1982), *aff'd*, 331 N.W.2d 342 (Wis. 1983).

**B.    Terms of the Digester Contract & General Conditions**

Analysis of whether the Digester Contract has been breached starts with the language of the Contract itself. In this matter, there are a number of contractual provisions that are important to the Court's legal analysis.

First, the Digester Contract is between Debtor as the Owner and DVO as the Design/Builder. (Debtor Ex. No. 1, p. 3.) Section 1.01 of the Digester Contract provides as follows:

Design/Builder shall complete all Work as specified or indicated in the Contract Documents. The Work is generally described as follows: Anaerobic digester engineering, construction and installation of the digester heating system, gas mixing system, and building interior plumbing and electrical work, digester startup, and project management and administration (see Attachment A).

(*Id.*)

Attachment A to the Digester Contract is perhaps the most significant of the documents that make up the Digester Contract, because it contains a description of items to be completed for

the Project and allocates the responsibility between DVO and Debtor for completing those items.
A "yes" next to an item indicates that it was to be included within DVO's scope of work, and a
"no" indicates that it was to be Debtor's responsibility. (Tr. Vol. 5, 57:5-58:24.)

The last page of the Digester Contract is also significant, in that it presents the estimated
budget for completion of the Digester and provides further evidence as to how those costs are to
be allocated between Debtor and DVO. (Debtor Ex. No. 1, p. 9.) Somewhat misleadingly titled
"WTE-S&S Enterprises, LLC. Anaerobic Digester System Costs – 6000 Head Heifer," this
document was described during trial both as the "build budget," (Tr. Vol. 1, 129:3-4) and as the
"engineering estimate." (Tr. Vol. 3, 254:2-4.) The Court will refer to it hereinafter as the "Build
Budget."

The Build Budget contains three columns: one column describing various parts of the
Project, one column with costs for each of the parts of the Project, and one column with the header
"[DVO] Costs," which corresponds to only those parts of the Project for which DVO bears
responsibility. (Debtor Ex. No. 1, p. 9.) The total project cost is listed at $3,820,205. (*Id.*) DVO's
portion of those costs is $1,057,205. (*Id.*) This $1,057,205 of DVO costs in the Build Budget is
the same number as the $1,057,205 Digester Contract price in section 4.01 of the SFOA. (Tr. Vol.
1, 130:23:131:3.)

The General Conditions of the Digester Contract provide additional evidence of the parties'
intentions on various topics. (Debtor Ex. No. 2.) For example, sections 1.01(33) and 1.01(47)
define the scope of the construction project and the work required to complete it: Section 1.01(33)
of the General Conditions defines the "Project" as "[t]he total construction of which the *Work* to
be provided under the Contract Documents may be the whole, or a part as indicated elsewhere in
the Contract Documents." (*Id.* at p. 6) (emphasis added.) Section 1.01(47) of the General

Conditions defines the "Work" as "[t]he entire construction or the various separately identifiable parts thereof required to be performed or furnished under the Contract Documents. Work includes and is the result of performing or furnishing Design Professional Services and Construction required by the Contract Documents." (*Id.* at p. 7.)

Section 1.01(12) of the General Conditions defines the "Contract Documents" as "[t]hose items so designated in the Agreement.[9]   Only printed or hard copies of the items listed in the Agreement are Contract Documents." (*Id.* at p. 5.) Section 1.01(2) of the General Conditions defines the "Agreement" as "[t]he written instrument which is evidence of the agreement between Owner and Design/Builder covering the Work." (*Id.*)

Section 1.02(2) of the General Conditions provides the parties' statement of how they chose to define when the construction is defective. (*Id.* at p. 7.) That section provides in part that "[t]he word 'defective,' when modifying the word 'Construction' refers to Construction that is unsatisfactory, faulty, or deficient in that it does not conform to the Contract Documents, or does not meet the requirements of any *inspection, reference standard, test or approval referred to in the Contract Documents. . . .*" (*Id.*) (emphasis added).

Section 3.02(A) defines which types of standards, specifications, and the like are meant by section 1.02(2). Section 3.02(A) states:

> Reference to standards, specifications, manuals or codes of any technical society, organization or association, or to Laws or Regulations, whether such reference be specific or by implication, shall mean the standard, specification, manual, code, or Laws or Regulations in effect on the last day for receipt of Proposals except as may be otherwise specifically stated in the Contract Documents.

(*Id.* at p. 9.)

---

[9] Article 8 of the Agreement provides that Contract Documents consist of the following: (1) the Agreement; (2) the General Conditions; (3) conceptual documents identified in the conceptual documents; (4) design/builder's proposal with Attachment A; and (5) additional documents which may be prepared after the effective date of the Agreement. (Debtor Ex. No. 1, p. 6.)

Section 1.01(23) of the General Conditions defines Laws or Regulations as "[a]ny and all applicable laws, rules, regulations, ordinances, codes and orders of any and all governmental bodies, agencies, authorities and courts having jurisdiction." (*Id.* at p. 6.)

Article 6 of the General Conditions sets forth DVO's responsibilities as the Design/Builder. (*Id.* at pp. 14-19.) Section 6.01(A) states "[t]he standard of care for Design Professional Services performed or furnished under this Agreement will be the care and skill ordinarily used by members of the engineering profession practicing under similar conditions at the same time and locality." (*Id.* at p. 14.)

Section 6.02(A) titled "Supervision and Superintendence of Construction" states as follows:

> Design/Builder shall supervise, inspect and direct the Construction competently and efficiently, devoting such attention thereto and applying such skills and expertise as may be necessary to provide the Construction in accordance with the Contract Documents. Design/Builder shall be solely responsible for the means, methods, techniques, sequences and procedures of Construction. Design/Builder shall be responsible to see that the completed Construction complies accurately with the Contract Documents and shall keep Owner advised as to the quality and progress of the Construction.

(*Id.* at p. 15.)

Section 6.04(A) titled "Services, Materials, and Equipment" states, in part:

> Unless otherwise specified in the Contract Documents, Design/Builder shall furnish or cause to be furnished and assume full responsibility for materials, equipment, labor, transportation, construction equipment and machinery, tools, appliances, fuel, power, light, heat . . . and all other facilities and incidentals necessary for the Work.

(*Id.*)

Article 12 of the General Conditions is titled "Tests and Inspections; Correction, Removal or Acceptance of Defective Construction." (*Id.* at p. 25.) Section 12.01(A) states: "[o]wner shall give Design/Builder prompt written notice of all defective Construction of which Owner has actual

23

knowledge.  All defective Construction may be rejected, corrected or accepted as provided in this Article 12." (*Id.*)

Section 12.04 is titled "Uncovering Construction." (*Id.* at p. 26.) Section 12.04(B) states, in part:

> If Owner considers it necessary or advisable that covered Construction be observed by Owner or inspected or tested by others, Design/Builder, at Owner's request, shall uncover, expose or otherwise make available for observation, inspection or testing as Owner may require, that portion of the Construction in question, furnishing all necessary labor, material and equipment.  If it is found that such Construction is defective, Design/Builder shall pay all costs and damages caused by or resulting from such uncovering, exposure, observation, inspection and testing and of satisfactory replacement or reconstruction, (including but not limited to all fees and charges of engineers, architects, attorneys and other professionals, all court or arbitration or other dispute resolution costs, and all costs of repair or replacement of work of others); and Owner shall be entitled to an appropriate decrease in the Contract Price, and, if the parties are unable to agree as to the amount thereof, Owner may make a Claim therefor as provided in Article 9.  If, however, such Construction is not found to be defective, Design/Builder shall be allowed an increase in the Contract Price or an extension of the Contract Times (or Milestones), or both, directly attributable to such uncovering, exposure, observation, inspection, testing, replacement and reconstruction.

(*Id.*)

Section 12.06 is titled "Correction or Removal of Defective Construction."  Section 12.06(A) states:

> Owner will have authority to disapprove or reject defective Construction and will have authority to require special inspection or testing of the Construction whether or not the Construction is fabricated, installed or completed.  If required by Owner, Design/Builder shall promptly, as directed, either correct all defective Construction, whether or not fabricated, installed or completed, or, if the Construction has been rejected by Owner, remove it from the Site and replace it with non-defective Construction.  Design/Builder shall bear all direct, indirect, and consequential costs of such correction or removal (including but not limited to fees and charges of engineers, architects, attorneys and other professionals and all court, arbitration, or other dispute resolution costs) arising out of or relating to such correction or removal.

(*Id.*)

Section 12.07 is titled "Correction Period." Section 12.07(A) provides:

If within one year after the date of Substantial Completion of the entire Work or such longer period of time as may be prescribed by Laws or Regulations or by the terms of any applicable special guarantee required by the Contract Documents or by any specific provision of the Contract Documents, any Construction is found to be defective, Design/Builder shall promptly, without cost to Owner and in accordance with Owner's written instructions, (i) correct such defective Construction, or, if it has been rejected by Owner, remove it from the Site and replace it with Construction that is not defective, and (ii) satisfactorily correct or remove and replace any damage to other Construction or the work of others resulting therefrom. If Design/Builder does not promptly comply with the terms of such instructions, or in an emergency where delay would cause serious risk of loss or damage, Owner may have the defective Construction corrected or the rejected Construction removed or replaced, and all costs, losses, and damages caused by or resulting from such removal and replacement (including but not limited to all fees and charges of engineers, architects, attorneys and other professionals, all court or arbitration or other dispute resolution costs, and all costs of repair or replacement of work of others) will be paid by Design/Builder.

(*Id.*)

Section 12.09 is titled "Owner May Correct Defective Construction." Section 12.09(A) states:

If Design/Builder fails within a reasonable time after written notice from Owner to correct defective Construction or to remove and replace rejected Construction as required by Owner in accordance with paragraphs 12.06.A or 12.07.A, or if Design/Builder fails to perform the Construction in accordance with the Contract Documents, or if Design/Builder fails to comply with any other provision of the Contract Documents, Owner may, after seven days' written notice to Design/Builder, correct and remedy any such deficiency.

(*Id.* at p. 27.)

Section 12.09(C) states, in part:

All costs, losses, and damages (included but not limited to fees and charges of engineers, architects, attorneys and other professionals, all court or arbitration or other dispute resolution costs and all costs of repair or replacement of work of others) incurred or sustained by Owner in exercising such rights and remedies under this paragraph 12.09 will be charged against Design/Builder and a Change Order will be issued incorporating the necessary revisions in the Contract Documents, and Owner shall be entitled to an appropriate decrease in the Contract Price.

(*Id.*)

C.    **Scope of DVO's Work under the Digester Contract**

The first step in the breach analysis is to determine the scope of the work under the Digester

Contract for which DVO was responsible. The Wisconsin Court has already determined that DVO

was not the general contractor for the construction of the Digester and was therefore not

responsible for all aspects of the Project. (Mot. in Limine Oral Ruling Tr. 15:11-19, Jan. 10, 2017.)

Despite this law of the case, that prior ruling does not take DVO off the hook entirely, for it was

still responsible for certain aspects of the construction under the Digester Contract.

DVO argues that Attachment A to the Digester Contract fully defines those portions of the

construction for which it is responsible. Debtor argues that Attachment A is ambiguous and that

extrinsic evidence establishes that DVO's construction responsibilities are broader than those

specified in Attachment A. The Court agrees with DVO that Attachment A is unambiguous and

fully sets forth those construction items for which DVO was responsible under the Digester

Contract.

First, the Court finds that Attachment A is not ambiguous. The General Conditions define

"Work" under the Digester Contract as "[t]he entire construction *or* the various separately

identifiable parts thereof required to be performed or furnished under the Contract Documents."

(Debtor Ex. No. 2, p. 7) (emphasis added). Attachment A is clearly a Contract Document, and it

unambiguously defines the identifiable parts of the Project that DVO is required to perform.

Notwithstanding the otherwise clear language of Attachment A, Debtor argues that

Attachment A is rendered ambiguous when read together with the Build Budget, another Contract

Document: "[t]here are numerous line items on [A]ttachment A that are not included in this [B]uild

[B]udget. There are numerous items on this [B]uild [B]udget that are not included in [A]ttachment

A." (Tr. Vol. 7, 8:17-21.) Significantly, however, Debtor has not provided the Court with a single

example to bolster this assertion nor otherwise explained how the interaction between the two

Contract Documents renders one of them ambiguous. The Court finds that the two documents are

in fact independent, serving different functions and showing different things. Attachment A shows

the Work that Debtor and DVO will respectively perform on the Project, while the Build Budget

provides an estimate of the cost for the overall Project. Thus, the Court finds the Digester Contract

unambiguous with regard to the scope of DVO's work.

As previously stated, items marked "no" on Attachment A are Debtor's responsibility;

items marked "yes" are DVO's responsibility. (Debtor Ex. No 1, p. 10.) The items that were part

of DVO's contractually defined Work, and marked "yes," included:

**Digester**
- Heat exchangers (in digester)
- Maintenance Heat Piping
- Piping Racks
- HDPE Draft Wall
- Diffuser Heads / Header / Gas Mixing
- Diffuser Blower System
- Sludge Recirculation Piping / Pump

**Equipment Building**
- Flame Arrestors
- Flare Equipment
- Bio-gas Blower / Pressure Regulator / Relief
- Bio-gas Interior Plumbing / Labor
- Controls for Water & Gas Circulation Systems
- Water Circulation Pumps
- Water System Interior Plumbing / Labor

**Engineering**
- Digester Design / PE Stamped Plans
- Heat Calculations / Control System Design
- Gas Collection System
- Assist with Permit Applications
- System Startup

(*Id.*)

The items that were *not* part of DVO's contractually defined Work, and marked "no," included:

**Digester**
- Concrete Floor
- Concrete Walls
- Spancrete / Cover / Sealant
- Insulation (4" for walls)
- Spray Foam Insulation (on digester cover)
- $H_2S$ Reduction System
- Excavation Services
- Crane Services

**Equipment Building**
- Gen-Set(s)
- Gen-Set Heat Exchangers
- Switch Gear / Power Co. Hookup / Transformers
- Separators / Manure Transfer Pumps / Waste Handling Equipment
- Solids Drier
- Telephone or Internet Line
- Overhead Truss Support for Digester Piping

**Engineering**
- Gen-Set Design
- Power Co. Coordination
- Project General Contractor

(*Id.*)

The Court therefore starts its analysis by finding that DVO's contractual responsibilities are those items, and only those items, marked as "yes" on Attachment A.

**D.      Alleged Breaches of the Digester Contract**

The Court now makes its findings of fact in relation to each of Debtor's alleged breaches of the Digester Contract by DVO. Based on its findings of fact, the Court will then determine whether DVO bears responsibility and whether it must pay for damages.

    *i.      Design and Construction of the Digester Vessel*

Debtor alleges that DVO breached the Digester Contract by making numerous errors in

designing and constructing the Digester vessel (the "Vessel"). Vessel engineering is listed as a "yes" item on Attachment A, under the label of "Digester Design/PE Stamped Plans." (*Id.*) Therefore, DVO was responsible for the design of the Vessel under the Digester Contract.

The Vessel consists of a 300-foot long tank with two side-by-side chambers which are each thirty-five feet wide. (Tr. Vol. 2, 202:21-203:1.) The aggregate width of the Vessel is therefore seventy feet. A thick concrete cover sits atop the Vessel in order to prevent "free oxygen" from entering the Digester. (*Id.* at 203:11-13.) A center wall running the length of the Vessel separates the two chambers and also serves as the interior load-bearing wall of the Vessel. (*Id.* at 220:19-25.) The center wall supports the roof of the Vessel by bearing the weight of the roof vertically and transmitting the force of that weight down to the foundation. (*Id.* at 222:14-21.) To attempt to increase its stability by spreading the load force laterally to the foundation, the bottom of the center wall has a footing that is three-feet wide and one-foot thick, with three No. 5 bars running parallel with the footing. (*Id.* at 221:15-23; 230:9-19; 231:6-19.) These bars are each 5/8-inch in diameter. (*Id.* at 221:21-23.) The intended effect of the center wall footing in the Vessel is to take the load forces being transmitted vertically from the central wall and to transfer those forces from the wall horizontally to the soil below. (*Id.* at 222:5-13.)

a.    Defect in the Design of the Vessel

Both parties used expert witnesses to determine whether the interior center wall footing of the Vessel was undersized, which would establish a design defect if found to be true. Both expert witnesses expressed their opinions to a reasonable degree of certainty.

Daniel Brellen testified as Debtor's expert witness. He works for McMahon Engineers and Architects as a licensed project engineer and structural engineer. (*Id.* at 182:23-183:18.) He has worked on approximately twenty-five anaerobic digester projects. (*Id.* at 186:9-11.) In each of

those engagements, he addressed the structural engineering aspects of those digester systems. (*Id.* at 186:24-187:5.) Brellen qualifies as an expert witness under Federal Rule of Evidence 702 with regard to the structural integrity and "code compliance" of the Vessel at the Farm. (*Id.* at 205:5-21.) He drafted the Vessel portion of the Anaerobic Digestion Facility Review Summary Report (the "McMahon Report"), which analyzes the engineering of the Digester. (Debtor Ex. No. 5.)

A foundation for a vessel may be either set deep within the soil or placed at a shallow depth. (Tr. Vol. 2, 217:1-5.) Its weight-bearing capabilities will be directly affected by (a) how deeply it is set within the soil and (b) the nature and pressure of the soil in which it is placed. The Vessel is supported by a shallow foundation, which from an engineering perspective means that soil pressure matters significantly to its structure. (*Id.* at 217:1-17.) Brellen explained that the design of the Vessel provided for an allowable soil-bearing pressure of 2,000 pounds per square foot ("PSF"), which is the allowable amount of pressure the soil below the Vessel itself can withstand. (*Id.* at 218:8-17.) The soil underneath the Vessel is clay-based, and for clay-based soil, the standard specified by NRCS Code 313[10] is an allowable soil-bearing pressure of 2,000 PSF. (Tr. Vol. 6, 41:14-21.)

The current center wall footing is three-feet wide by one-foot thick and contains three No. 5 bars running parallel with the footing. (Tr. Vol. 2, 221:15-23; 230:9-19; 231:6-19.) It does not have any other bars running perpendicular to the footing itself. (*Id.* at 231:6-13.) Brellen opined that, with these characteristics, the center footing will bear all of the downward force with no ability to spread any of that force horizontally at ground level. (*Id.* at 231:14-19.)

Brellen opined that the interior center wall footing of the Vessel is undersized and therefore

---

[10] The NRCS is an agency of the United States Department of Agriculture. NRCS Code 313 is titled "Conservation Practice Standard Waste Storage Facility" and applies to agricultural waste storage. (Tr. Vol. 2, 199:10-200:4.)

overstressed. (*Id.* at 232:11-15.) He testified that the undersized and overstressed center wall

footing is due to a failure to abide by the standard of care expected of an engineer designing or

approving this Vessel, which failure he characterized as an error in engineering and management

committed by Steve Dvorak. (*Id.* at 232:16-233:2.) In arriving at this conclusion, Brellen

reviewed certain documents relating to the Digester and the applicable code for waste-storage

facilities. (*Id.* at 197:1-12; 199:10-200:10; 203:18-205:4.) Specifically, Brellen reviewed NRCS

Code 313 for waste-storage facility specifications and the American Society of Civil Engineers

Code No. 7 for design forces and loads that apply to structures. (*Id.* at 199:10-23.) Brellen

requested, but never received, the structural calculations for the Vessel from DVO. (*Id.* at 200:11-

201:2.)

The reason for this opinion, Brellen testified, is that the wall footing is not wide enough to

properly transmit the vertical forces from the Vessel horizontally to the soil underneath. (*Id.* at

229:7-14.) To transmit the weight generated by this Vessel properly, the wall footing needs to be

three-and-a-half to four feet wide. (*Id.* at 256:21-25.) Brellen believed that the decision to use

three-foot wide wall footings originated from an assumption in design that the soil underneath the

Vessel was granular-based, rather than clay based. (*Id.* at 261:18-262:7.) A granular-based soil

would allow for a 3,000-PSF capacity and necessitate only a three-foot wide wall footing. (*Id.*)

The soil underneath the Vessel, however, is clay-based and would require a wider footing to permit

horizontal ground-level transmission of the wall's weight. Brellen also opined that even if one

poured compacted gravel to a depth of six-inches prior to laying the foundation, the need for wider

wall footings would not change, because the soil underneath the gravel would remain clay-based.

(*Id.* at 262:10-25.)

Brellen further opined that the undersized and overstressed wall footings could lead to

settlement of the Vessel because the soil does not have adequate strength to support the Vessel. (*Id.* at 233:14-23.) Eventually, settlement could lead to cracks in the foundation. (*Id.* at 260:7-12.) Thus, Brellen stated that settlement would compromise the structural integrity of the Vessel. (*Id.* at 233:14-234:1.)

Brellen testified that he could not say whether there was in fact cracking or settlement in the Vessel. (*Id.* at 234:2-5.) He stated that the only effective way to make that determination would be to have the Vessel emptied and observed from the inside to see if there are signs of settlement or cracking. (*Id.* at 234:6-13.) In reaching his conclusions and offering his opinions, Brellen did not calculate the current PSF of the Vessel in his testimony or his portion of the McMahon Report.

James Todd, expert witness for DVO, has worked at Excel Engineering as a senior structural engineer for the past seven years. (Tr. Vol. 5, 204:4-12.) Todd's main responsibility involves assessing building structures. (*Id.* at 204:13-21.) He is licensed as a professional engineer in thirteen different states, including Wisconsin. (*Id.* at 208:16-24.) Todd has worked on well over one-hundred manure storage tanks during his career. (*Id.* at 206:13-15.) However, his experience with anaerobic digesters has been exclusively for DVO projects with a possible exception of work performed for a party other than DVO. (*Id.* at 207:3-23.) Steve Dvorak hired Todd to help him design the Vessel prototype for the Digester at the Farm. (Tr. Vol. 6, 35:12-24.) Dvorak, however, altered the prototype. (*Id.* at 43:22-44:1.) The Court accepted Todd as an expert witness under Federal Rule of Evidence 702 to opine on the structural engineering of the Vessel, specifically, the integrated floor and footing underneath the interior central wall. (Tr. Vol. 5, 224:21-225:6.)

Todd was offered by DVO for his analysis of the McMahon Report regarding the Vessel. (*Id.* at 223:13-20.) Todd reviewed DVO's Digester design documents, the McMahon Report, and Brellen's deposition testimony. (*Id.* at 223:13-224:6.) To render his expert opinion, Todd also performed calculations relating to the structure of the Digester. (*Id.* at 224:10-20.)

Prior to engaging Todd as an expert witness, DVO asked him to review and inspect work on the Digester in support of Debtor's Section 1603 Grant in exchange for compensation. (*Id.* at 210:8-12.) Todd performed an on-site inspection in December of 2010 for all work involving the Digester at DVO's manufacturing facility. (*Id.* at 212:6:19.) Todd took pictures, created a report, and eventually provided these items to DVO. (*Id.* at 212:6-213:10.) Todd performed a similar on-site inspection again in December of 2011 at the Farm. (*Id.* at 213:16-21.) During that second inspection, Todd observed the Vessel, the gen-set building, and the reception pit. (*Id.* at 214:14-24.) Todd noted that he did not observe any cracking, heaving, or localized settlement of the floor slab on his second visit, sixteen days after the concrete slab was poured. (*Id.* at 221:2-9.) He did not observe any abnormalities in the concrete foundation twenty-nine days later either. (*Id.* at 223:6-12.) Todd admitted, however, he could not view the actual roof of the Vessel, because there was four inches of insulation on top of it. (Tr. Vol. 6, 55:4-21.)

Todd did not agree with Brellen's opinion that the interior center wall of the Vessel is undersized and provided three reasons why he disagreed with that opinion. (Tr. Vol. 5, 225:25-226:10.)

Todd first explained, "there's a pretty high factor of safety in the allowable . . . soil bearing number that is used to calculate a footing." (*Id.* at 226:5-10.) That safety factor is three—meaning that it would take three times the stated safe load to produce a failure of the bearing wall. (*Id.* at 226:5-17.) This safety factor of three is a well-established technical principle used to calculate a

factor of safety on bearing pressures. (Tr. Vol. 6, 6:12-17.) He also testified that for clay-based

soil, NRCS Code 313 requires that the safe load for the footing used on this Digester was 2,000

PSF, which means that the footing should not actually fail so long as the load is less than 6,000

PSF. (Tr. Vol. 5, 226:18-227:1.) Todd calculated the current PSF on the interior central wall

footing by adding the weight of the plank and the weight of the wall, then dividing the sum by

three feet. (Tr. Vol. 6, 15:7-14.) Based on his calculations, the interior wall footing faces a

pressure of 2,239 PSF, a pressure falling well below the actual bearing failure pressure of 6,000

PSF. (*Id.* at 8:7-20.)

Based on these calculations, Todd opined that there was no significant risk of settlement

or cracking of the Vessel, because the small additional settlement from the overbearing, estimated

at only one-eighth of an inch, would not affect the operation of the Digester. (*Id.* at 6:18-7:10;

27:12-28-2.) He also stated that he did not believe that settlement had occurred because, if it had,

it would have resulted in cracks on top of the Vessel and, according to his observations, no such

cracks were present. (*Id.* at 26:13-27:11.)

Finally, Todd found that because the footing is poured underneath the floor, the floor itself

can help spread out the load, thereby reducing pressure. (Tr. Vol. 5, 227:17-21.) The floor

contains steel rods that go through the footing underneath the wall, running both parallel and

perpendicular to the wall. (Tr. Vol. 6, 7:11-20.) Todd concluded that there was nothing unsafe

about the Vessel; it did not need to be replaced; and it did not need to be repaired or altered. (*Id.*

at 25:17-26:7.)

At trial, Todd's testimony contradicted his earlier deposition testimony in significant ways.

First, at trial, Todd testified that the center wall footing was built to code. (*Id.* at 47:1-4.) In his

deposition testimony, however, Todd stated the opposite: that the center wall footing was not built

to code. (*Id.* at 47:5-8.) He acknowledged that this was a change in his testimony. (*Id.* at 47:9-12.)   Second, Todd changed his testimony on the question of whether the Vessel satisfies the standards of NRCS Code 313.  At trial, Todd opined that the Vessel was built to code, but at his deposition he stated the exact opposite. (*Id.* at 47:13-48:13.) He acknowledged this change in his testimony. (*Id.* at 48:10-13.)   Third, Todd changed his testimony regarding how the Digester Contract defines defective construction.  At trial, Todd testified that the Digester Contract would not necessarily define defective construction as work that does not comply with code. (*Id.* at 48:17-23.)  In his deposition, however, Todd stated the opposite. (*Id.* at 48:24-50:1.)  Todd acknowledged this change in his testimony. (*Id.* at 50:2-6.)  Todd's multiple and significant changes in his testimony negatively impact his credibility as an expert witness.

For the following reasons, the Court finds that Debtor's expert, Brellen, offered the more credible, independent, and convincing explanation of the current state of the Vessel:   First, DVO failed to call an independent expert witness to testify on its behalf.  Todd described himself as independent and neutral, but this self-characterization was based only on the fact that he is not currently an employee of, or a contractor for, DVO. (*Id.* at 53:11-20.)  His self-characterization ignores the fact that his entire experience with digesters is almost exclusively with DVO's projects. From 2004 to 2016, Todd worked on approximately eighty projects for DVO. (*Id.* at 52:24-53:2.) He even contracted with Steve Dvorak to provide DVO with a prototype for the very Digester on which he is now offering expert testimony.  He also performed two grant inspections relating to the Digester in exchange for compensation.  Even if he is no longer receiving compensation from DVO for his work in the design and construction of the Digester, he still has an undeniable and strong reputational ground for rejecting criticisms of the design or construction of this Digester, which he himself helped to design.

Todd's credibility also suffered from the multiple times throughout his testimony when he was impeached. For example, Todd changed his deposition answers at trial with respect to at least three critical areas: (1) whether the center wall footing complied with applicable code requirements; (2) whether the Vessel itself complied with applicable codes; and (3) how the Digester Contract defined defective construction. Given the partiality and lack of credibility of Todd's expert testimony, the Court affords his testimony little weight and gives more weight to Brellen's testimony.

Despite Todd's lack of credibility and impartiality with respect to his expert testimony, the Court finds his lay witness testimony regarding his observations of the Vessel in December of 2011 to be credible.[11] *See, e.g., United States v. Moreland*, 703 F.3d 976, 983 (7th Cir. 2012) (separating the testimony of witness into lay and expert). Unlike Brellen, Todd actually inspected the Vessel and did not observe any stress cracks in the foam insulation on top of the Vessel cover parallel to the interior center wall. (Tr. Vol. 6, 25:9-16.)

Brellen testified that to transmit the weight generated by this Vessel properly, the wall footing needs to be three-and-a-half to four feet wide. The wall footing of the Vessel as construction is only three-feet wide. Thus, Brellen concluded that the center wall footing is undersized and does not comply with NRCS Code 313. The Court rejects Todd's testimony on this issue for the reasons set forth above. Accordingly, the Court finds that the current design of the center wall footing is undersized due to its failure to comply with NRCS Code 313.

---

[11] The Court also accepts Todd's opinion that the safety codes contain a margin of error permitting up to three times the stated load limits before failure is assumed to occur. Debtor's expert did not contradict or criticize this opinion and it is a type of generalized engineering opinion not specifically linked to this particular Digester, and therefore not subject to the Court's criticisms of Todd's other expert opinions.

b.   Lack of Compliance with NRCS Code 313

Pursuant to the General Conditions of the Digester Contract, defective construction encompasses all construction that is "unsatisfactory, faulty, or deficient, in that it does not conform to the Contract Documents, or does not meet the requirements of any . . . reference standard[.]" (Debtor Ex. No. 2, p. 7.)   The General Conditions define reference standards as a standard, specification, code, law, or regulation. (*Id.* at p. 9.)

Because the only uncontroverted testimony before the Court is that the Vessel does not comply with NRCS Code 313, the Court finds that the design of the Vessel is defective, which in turn makes the construction of the Vessel defective under the terms of the Digester Contract.

Given a plain reading of the Digester Contract and General Conditions, the Court finds that DVO breached the Digester Contract when it rendered drawings for the Vessel by designing the interior central wall footings too narrow to be in compliance with NRCS Code 313.   Although Attachment A provides that DVO does not bear responsibility for the concrete pouring of the Vessel, the concrete pouring was predicated upon the design that DVO provided.   As a result, the root cause of the defective construction stems from the design by DVO.   But, as discussed below, that failure to conform to code does not mean that the Vessel itself has settled or cracked, or is otherwise unable to be operated safely and effectively.

c.   Assessing Damages

The Court agrees with Debtor that, under the terms of the Digester Contract, DVO's design of the Vessel constitutes defective construction, because it fails to comply with NRCS Code 313. But Debtor must still prove that it is entitled to recover damages from DVO due to the undersized center wall footing in the Vessel.   Debtor asks the Court to award damages of $988,475 to replace the entire Vessel and all the attendant component parts or, in the alternative, $655,000 to clean out

the Vessel and check for cracks or settlement issues. (Tr. Vol. 2, 111:2-9; Debtor Ex. No. 37; Tr. Vol. 3, 116:24-117:13; Debtor Ex. No. 5, p. 24.) For the reasons stated below, the Court denies Debtor's request for any damages with respect to the Vessel.

Brellen testified that the only way to determine whether there has been settling or cracking at the spot where the center wall hits the Vessel floor is to empty, clean, and observe the inside of the Vessel. (Tr. Vol. 2, 234:2-16.) In the event the inspection after cleanout showed cracking or settlement of the center wall, the only options for Debtor would be to repair and replace the inside footing itself or to replace a significant portion of the Vessel altogether. (*Id.* at 235:7-13.) The Vessel could also undergo "soil strengthening" to remedy the design defect if cracking is revealed. (*Id.* at 235:14-236:10.) Soil strengthening is a geotechnical service in which epoxy, grout, or disks of stone are added to the soil underneath the Vessel to strengthen the soil. (*Id.* at 235:14-236:2.) Regardless, all remedies would require the Vessel to be cleaned out.

Chad Olsen, the other expert witness for Debtor, testified that cleaning out the Vessel would cost roughly $655,000. (Tr. Vol. 3, 116:24-117:13.) Olsen stated that this figure has several components. (*Id.* at 117:14-19.) The first component consists of an estimated cost of $250,000 to empty and clean out the Vessel, an estimate which was provided by Al Kohlman of Veolia. (*Id.* at 117:14-22; DVO Ex. No. 125.) The remaining estimated costs projected by Olsen consist of loss of electrical revenue, propane to heat the Vessel, and bedding costs to Randy Schmidt. (Tr. Vol. 3, 117:23-122:1; Debtor Ex. No. 5, p. 24.) This estimation assumed that the Digester would not operate for roughly six months. (Debtor Ex. No. 5, p. 24; Tr. Vol. 3, 120:22-121:10.)

Under Wisconsin law, "[d]amages must be proven with reasonable certainty[,]" *Designer Direct*, 368 F.3d at 752, and "a claimant cannot recover for speculative or conjectural damages," *Sopha*, 601 N.W.2d at 634. Perhaps more significantly, under the "economic waste" doctrine

applicable to suits for breach of contract in Wisconsin, courts are to conclude that repairs result in "economic waste" when they either result in "unreasonable destruction of the work done" or the cost of the repairs is "materially disproportionate to the value of the corrections." *W.G. Slugg*, 214 N.W.2d at 416. As discussed above, the diminished value of the property is the hypothetical value of the property without the defect, minus the actual value of the current property with the defect. *Champion Cos. of Wis.*, 794 N.W.2d at 919. If the cost-of-repair/restoration approach and the diminished-property-value approach result in different damage estimates, the court is to award the smaller of the two. *Laska*, 231 N.W.2d at 200.

Debtor's claim for damages to clean out, inspect and, if necessary, repair the Digester founders upon both of these legal standards for awarding breach-of-contract damages under Wisconsin law. First, Debtor's proof of damages was speculative, conjectural, and not reasonably certain. For example, Debtor offered no evidence at trial to indicate whether an inspection of an empty and cleaned Vessel would reveal any damage whatsoever. In particular, it offered no evidence or testimony to indicate that the integrated concrete interior center wall footing and Vessel floor have in fact settled beyond the parties' expectations at the time of contracting, or that any cracks have formed in the concrete Vessel floor slab. (Tr. Vol. 2, 234:2-13.) Nor did Debtor also offer any evidence that the Vessel is leaking due to the design and/or construction of the integrated concrete interior center wall footing and Vessel floor, or for any other reason. (*Id.* at 264:3-6.). Finally, Debtor has failed to demonstrate that the Digester is unable to be operated safely and effectively due to the lack of compliance with NRCS Code 313. The Digester has been operating and producing biogas since construction was completed in January 2012. (DVO Ex. No. 8; Tr. Vol. 6, 60:19-21.). In short, Debtor has failed to prove that the structural integrity of the Vessel has in fact been compromised because of the undersized center wall footing.

Of equal significance, the "economic waste" doctrine clearly applies to the facts of this case. The cost of shutting down Digester operations and then cleaning out and inspecting the Digester is undeniably very large, while Debtor has failed to establish with reasonable certainty that the inspection would uncover any damage at all. Indeed, given the testimony of DVO's expert Todd (which this Court has accepted)[12] that there is a safety factor of three—meaning that it would take three times the safe load set forth in NRCS Code 313 to produce a failure of the bearing wall— it appears to the Court that the possibility of finding actual damage to the interior of the Digester from the undersized interior wall is in fact remote. Under these circumstances, Wisconsin law requires the Court to award as damages the smaller of the estimates calculated under the cost-of-repair/restoration approach and the diminished-property-value approach. *See Laska*, 231 N.W.2d at 200. In this case, that value is zero, for the reasons discussed above.

ii.     *Allegedly Defective Design of the Reception Pit*

Debtor next alleges that the reception pit designed by DVO is defective, and it seeks $110,000 in damages to remedy that defect. DVO contends that a reception pit was not included as part of its scope of work under the Digester Contract and that it designed the reception pit at no charge in an effort to save Debtor money.

A reception pit acts as a collection point for the manure at the Farm and for handling substrates.[13] (Tr. Vol. 3, 44:23-45:10; Vol. 5, 195:23-196:2.) In the beginning of the Project, the

---

[12] As previously discussed, Todd opined that the safety codes themselves contain a margin of error of three times the listed load limit. While the Court has rejected Todd's other expert conclusions regarding this specific Digester, his recitation of what the safety codes require is not limited to this Digester and was not rebutted by Debtor. The Court therefore accepts this portion of his expert testimony.

[13] The reception pit is split into two compartments: The first compartment holds raw manure which is then pumped to the Digester. The second compartment receives the effluent from the Digester. This effluent is then either pumped to a lagoon or to another reception pit on the Farm for use at the Farm. (Tr. Vol. 3, 61:5-23; 71:15-18.) The manure makes it way to the reception pit through underground piping, which is known as the manure transfer system. (*Id.* at 61:24-62:6.)

Farm had an existing reception pit. (Tr. Vol. 4, 124:14-21.) That reception pit was originally intended to be used in connection with the Digester. (See Tr. Vol. 5, 20:21-22:5.) At some point, a second reception pit[14] was added to the Project. (Debtor Ex. Nos. 11, PL1-A, & PL5-C.)[15]

The reception pit is not listed on Attachment A of the Digester Contract. (Debtor Ex. No. 1, p. 10.) However, it is addressed in the Build Budget, which provides that it is a Debtor responsibility with an estimated cost of $135,000. (*Id.* at p. 9.) Nevertheless, Debtor argues that DVO is responsible for the reception pit, because it is included as part of DVO's "Engineering/Start-Up" responsibility referenced in the Build Budget. (Debtor Proposed Findings & Conclusions, ¶ 504.)

Debtor did not offer any evidence that the Engineering/Start-Up category included the design of a reception pit. DVO, on the other hand, elicited testimony from Brickl regarding the

---

[14] The reception pit is a below-grade concrete structure that is thirty feet long, twenty-four feet wide, and ten feet deep. (Tr. Vol. 3, 87:16-88:1.)

[15] The testimony regarding the decision to add a second reception pit was conflicting. According to Steve Dvorak and Corey Brickl, after SVP purchased a majority interest in Debtor, the scope of the Project changed. (Tr. Vol. 5, 89:17-90:2; *see also* Tr. Vol. 4, 154:9-158:1.) Originally, a 710kW engine was purchased for the Digester system but was replaced with a larger, 1000kW engine. (Tr. Vol. 4, 154:9-158:1; Randy Schmidt Dep., 35:20-36:8; 54:21-55:2.) The increased engine size necessitated adding outside substrates to the manure in order to generate additional biogases to fuel the engine. (Tr. Vol. 4, 295:3:19.) The existing reception pit could no longer be used due to its location, which did not allow for access by semi-trucks that carry the substrates. (*Id.* at 154:2-159:5; 295:3-19.) Thus, a new reception pit was needed to bring additional substrates to the Digester. (Tr. Vol. 5, 117:7-10.) Dvorak testified that DVO designed and engineered that structure sometime in 2011. (*Id.* at 117:11-24; 189:21-190:6; Tr. Vol. 4, 153:19-154:5.) He did not charge Debtor for the reception pit in an effort to keep costs down for Debtor. (Tr. Vol. 4, 154:6-8; 161:1-10.) The decision was made by Dvorak and Crowther to direct the design of this new reception pit. (Tr. Vol. 5, 116:24-117:6.) The addition of a second reception pit was a group decision made by Philip, Crowther, DVO, and Randy Schmidt. (Tr. Vol. 4, 158:11-160:6.) Schmidt was an integral part of the plans to create the second reception pit, because he would be the owner of that reception pit. (*Id.* at 159:18-160:11.)

By contrast, Philip testified that neither he nor Crowther made the decision to add a second reception pit. (Tr. Vol. 6, 233:20-234:5.) He stated that after mid-January 2011 he received plans for the Digester and the reception pit was already on the plans that he saw. (Tr. Vol. 2, 55:17-56:3; Tr. Vol. 6, 234:6-14) In addition, in an email communication dated December 17, 2010 from Nackers that did not copy Philip and Crowther, plans for a new reception pit were discussed, and the email indicates that a copy of the completed reception pit plans was attached. (Debtor Ex. No. PL1-E.) Nackers confirmed that the new reception pit was already being contemplated as of December 17, 2010. (Tr. Vol. 4, 321:3-6.) For purposes of deciding whether DVO is liable on a breach of contract claim, the Court need not resolve this conflicting testimony. The Court is acknowledging this testimony, because the parties devoted extensive time to this issue during trial.

work that was included in the Engineering/Start-Up category. He testified that the listed cost of

$320,000 in this category is a standard fee charged by DVO for all of its digester projects and is

based on the overall cost of the Digester in addition to a percentage of the Digester system. (Tr.

Vol. 3, 255:8-16.) This figure includes the Vessel, the design of the heating and mixing systems,

the design of the biogas system, and the design of the biogas collection system. (Tr. Vol. 5, 61:24-

62:7.) Thus, the Court finds that the reception pit was not included as DVO's responsibility under

the Engineering/Start-Up category in the Build Budget and that DVO was not responsible for the

reception pit under the Digester Contract.

Next, Debtor argues that DVO is responsible for the reception pit, because "Steve Dvorak

stamped the reception pit plans as of January 5, 2012, and by doing so took responsibility for

them." (Debtor Proposed Findings & Conclusions, ¶ 457.) In support of that argument, Debtor

relies on its expert witness, Brellen, who testified that Dvorak's stamp on the construction

drawings signifies that he is "taking full responsibility for all engineering elements." (Tr. Vol. 2,

233:1-13.)

The stamp on the reception pit plans contains the following language: "TO THE BEST OF

MY PROFESSIONAL KNOWLEDGE, JUDGEMENT AND BELIEF, THIS METHANE

DIGESTER IS INSTALLED IN ACCORDANCE WITH THESE AS BUILT CONSTRUCTION

DRAWINGS, SPECIFICATIONS AND MEETS APPLICABLE NRCS STANDARDS."

(Debtor Ex. No. PL1-A.) Below that language is Dvorak's signature and stamp, which identifies

him as the professional engineer. (*Id.*) The plans also indicate that they are "Proprietary Property

of [DVO]." (*Id.*)

On its face, the stamped language on the plans is Dvorak's acknowledgement that the

Digester is installed in accordance with the construction drawings and meets applicable NRCS

standards. It does not, contrary to Brellen's testimony, necessarily indicate that Dvorak is "taking full responsibility" for implementing the reception pit plans. The testimony of Brellen regarding the significance of this stamp is a legal conclusion for the Court to make. Moreover, Brellen's testimony that Dvorak is "responsible for all engineering elements" of the reception pit is unclear. He did not explain what constitutes "engineering elements," and the stamp itself does not reference "engineering elements." Instead, it provides only that the Digester is "installed in accordance with these as built construction drawings." (*Id.*) Debtor has not argued that the Digester was not installed in accordance with the construction drawings, and Debtor has failed to demonstrate that this stamp required Dvorak to construct a reception pit that was larger than the one that was in fact constructed.

In short, Debtor has failed to show how Dvorak's engineering stamp on the site plans provides a legal basis for holding DVO liable on a breach of contract claim. As stated above, the Digester Contract did not require DVO to provide a reception pit. Debtor also provided no evidence suggesting that DVO or Dvorak intended to amend the contract for DVO to assume a contractual obligation it did not originally bear. The Court is unwilling to assume that Dvorak's engineering stamp alone demonstrates such an intent on the part of DVO. Whether a professional engineer's stamp on plans imposes an independent duty on that engineer is determined by state law. *See generally*, *McConnell v. Servinsky Eng'g, PLLC*, 22 F. Supp.3d 610, 618 (W.D. Va. 2014). Debtor has not brought a separate cause of action against Dvorak based on his professional liability under the stamp. Nor has Debtor addressed whether such an independent cause of action is recognized under Wisconsin law. In any event, Debtor has failed to show how Dvorak's status as a professional engineer and his stamp on the site plans created an independent basis for liability of DVO separate and distinct from any contractual duties already existing between DVO and

Debtor pursuant to the Digester Contract.

Debtor spent extensive time during trial introducing evidence allegedly demonstrating that the design of the reception pit was defective. But because the Court finds that Debtor failed to show that DVO had any responsibility to provide a reception pit under the Digester Contract in the first place, the Court need not address whether DVO's design of the reception pit constitutes a breach of the Digester Contract.

Even if the Court were to conclude that it was DVO's responsibility under the Digester Contract to provide the second reception pit, Debtor has failed to demonstrate a reasonable certainty of damages arising from the design or construction of that pit. Debtor's expert witness, Chad Olsen, testified that the reception pit is undersized and the elevation is set too low, which, in his view, constitute engineering and design defects. (Tr. Vol. 3, 93:3-94:19.) However, his basis for that conclusion was not clearly articulated. His opinion appears to be based on a worst-case assumption that, in the event of a power outage, the manure flowing into the reception pit would exceed the capacity of the reception pit, which would in turn result in a spill. (*Id.* at 90:2-94:19.) But Debtor has failed to show how this hypothetical overflow situation would constitute a breach under the Digester Contract. Thus, the Court finds that even if DVO was contractually obligated to provide a reception pit, Debtor has failed to show that the DVO-constructed reception pit is not functioning properly.

Accordingly, the Court finds that Debtor failed to establish that it is entitled to recover $110,000 from DVO to remedy the alleged defects in the reception pit.

### iii.    *Over-Pressurized Gas Recirculation System*

Debtor alleges that DVO breached the Digester Contract by failing to lower the gas pressure to under 12 pounds per square inch ("PSI"), the limit set forth in the Digester's operations

44

and maintenance manual.

The gas recirculation system recirculates biogas through the Vessel to ensure that the manure properly circulates and flows within it. (Tr. Vol. 2, 174:16-21.) It works by taking a small amount of the gas produced by the Digester, compressing it, and re-injecting it into the bottom of the Vessel, where it rises and helps to mix the liquid manure in the Vessel. (Tr. Vol. 3, 63:6-20.) One of the purposes of keeping the manure stirred up and flowing through the system is to prevent solids from being deposited at the bottom of the Vessel. (*Id.* at 110:11-15.) These buildups occur when solids settle at the bottom. (*Id.* at 110:16-21.) One of the negative effects of such deposition is that it reduces the inner space of the Vessel available for digestion, effectively rendering the Vessel smaller than originally designed. (*Id.*)

The gas recirculation system is within the scope of DVO's work as design/builder. Section 1.01 of the SFOA sets forth the work to be completed by DVO, including the "gas mixing system." (Debtor Ex. No. 1, p. 3.) Further, the "Gas Collection System" is marked as a "yes" item on Attachment A of the Digester Contract. (*Id.* at p. 10.) Therefore, DVO is responsible for the gas-recirculation system. Debtor asks the Court to award damages of $655,000 in order to clean out the Digester, which it claims has been necessitated by the heightened PSI levels.

Debtor argues that the gas recirculation system has been running "over spec" – meaning above the designated PSI limit of 12 set forth in the Digester's operations and maintenance manual. (Debtor Ex. No. 19.) The recommended range for the PSI is between 7 and 12. (Tr. Vol. 4, 107:3-6.) Overpressure in the gas recirculation system is a problem, because it reduces the effectiveness of the mixing system, resulting in the accelerated deposition of solids. (Tr. Vol. 3, 116:10-23.)

Crowther testified that an overpressure problem in the gas recirculation system existed before it was even turned on in January 2012. (Tr. Vol. 6, 141:6-13.) Specifically, Philip testified

that from January through March 2012, the gas recirculation system was running above 12 PSI. (Tr. Vol. 2, 177:23-178:23; Debtor Ex. No. PL2-F.) Adam Nackers of DVO agreed that when the Digester was started up, the gas recirculation system was running "above our recommended window." (Tr. Vol. 5, 4:4-14.)

Crowther testified that the overpressure in the gas recirculation system continues to occur. (Tr. Vol 6, 141:6-17.) However, he did not provide the basis to substantiate this claim. The only credible evidence submitted by Debtor on this issue consists of charts demonstrating readings of the PSI in the Vessel from January 2, 2012 through March 17, 2012. (Debtor Ex. No. PL-2-F; *see also* Tr. Vol. 2, 177:23-179:2.)[16] These readings show that overpressure was an issue during a three-month period in early 2012, when the PSI ranged approximately from 10-13. (Debtor Ex. No. PL2-F.) A sight visit report put into evidence by DVO demonstrates that the PSI levels continued to be elevated through early 2013. (DVO Ex. No. 96.) This report is dated February 27, 2013 and was prepared by Nackers for Debtor. (*Id.*) The report indicates that at that time, PSI levels ranged from 15-20. (*Id.*) DVO made recommendations on how to fix this problem, and actions undertaken by DVO in April 2013 resolved the high pressure problem in some zones of the system but not others. (Tr. Vol. 4, 307:7-14.)

Based on this evidence, the Court finds that, at most, Debtor has demonstrated that the PSI levels were elevated from startup through April 2013 and for an unspecified period thereafter. The evidence presented by Debtor lacked the requisite specificity to demonstrate that the overpressure problem has been continuous since the startup or that it continues to persist to the time of the trial.

---

[16] The Court notes that the first entry on the chart at Debtor Ex. No. PL2-F shows a reading date of 1/2/2011. The year of 2011 appears to be a mistake because the following entry is dated 1/3/2012 and the entries made after that date on nearly a daily basis are dated 2012, not 2011. In addition, when testifying about this exhibit, Philip stated that the chart demonstrates that the pressure in the gas recirculation system was over spec in January of 2012. (Tr. Vol. 2, 167:6-11.)

The Court therefore rejects Debtor's claim that overpressure in the Vessel is ongoing.

Even if the Court were to accept Debtor's claim that PSI continues to be elevated, Olsen's testimony on the effect of elevated PSI in the Vessel was ambiguous. He opined that the high pressures reduced the efficiency or effectiveness of the mixing system, which resulted in the accelerated deposition of solids in the Vessel, thereby necessitating the need to empty and clean the Digester "quicker or sooner." (Tr. Vol. 3, 116:10-23.) This contention is overly general. First, Olsen did not specify how frequently the Digester must be cleaned out in the ordinary course for routine maintenance (that is, if the PSI is within the range specified in the Digester's operations and maintenance manual).[17] Second, he did not specify the amount of time by which the overpressure issue reduced the ordinarily required clean out period. His testimony that it needs to be done "quicker or sooner" is vague and therefore insufficient to establish that elevated PSI levels have resulted in damages to Debtor. Accordingly, the Court finds that Debtor failed to establish that DVO breached the Digester Contract with respect to the gas recirculation system.

DVO did not offer any expert testimony to contradict that of Olsen. However, regardless of DVO's failure to challenge Olsen's testimony, the burden was on Debtor to demonstrate that an over-pressure in the gas recirculation system was a breach which resulted in damages. By failing to specifically tie the elevated PSI levels to the length of time by which the need to clean out the Digester decreased, Debtor has failed to show that it suffered damages. Even if the Court were to accept Olsen's testimony on the need to clean out the Digester sooner rather than later, awarding Debtor $655,000 to clean out the Digester – which it has to do anyway for routine maintenance – is excessive and not based on actual damages. Thus, the Court finds that Debtor has failed to

---

[17] The Court notes that, at the evidentiary hearing on a motion for a preliminary injunction brought by Debtor against Randy Schmidt, the Court found that the evidence presented showed the Digester should be cleaned out approximately every five to seven years. *WTE-S&S Ag Enters., LLC v. S&S Ag Enters., LLC*, Adv. No. 16 A 719, Dkt. No. 99.

establish damages to a reasonable certainty.

Further, DVO has demonstrated that Debtor did not take reasonable means to avoid or minimize any damages that resulted from the high pressure in the gas recirculation system. Wisconsin law requires an aggrieved party to mitigate its damages, "that is, to use reasonable means under the circumstances to avoid or minimize the damages." *Kuhlman, Inc. v. G. Heileman Brewing Co.*, 266 N.W.2d 382, 384 (Wis. 1978). The aggrieved party cannot recover damages that could have been avoided. *Id.* "The burden of proof is on the delinquent party to show that the injured party could have mitigated its damages." *Id.*

Nackers provided detailed testimony regarding the possibility of multiple factors that could lead to elevated pressures in the gas recirculation system. (Tr. Vol. 4, 306:16-308:8.) These factors were outlined in a site visit report he prepared for Debtor dated February 27, 2013. (DVO Ex. No. 96.) In that report, he stated that the increased pressure must be the result of a restriction somewhere in the system. (*Id.*) DVO made recommendations on how to fix this problem, and actions undertaken by DVO in April 2013 resolved the high pressure problem in some zones of the system but not others. (Tr. Vol. 4, 307:7-14.) DVO recommended that Debtor perform further work to determine whether the blockage is inside the gas recirculation pumps. The cost of that work was estimated to be between $5,000 and $6,000, but Debtor did not conduct the recommended testing. (*Id.* at 307:15-308:8.) Thus, it is possible that Debtor could have avoided the damages it claims resulted from the overpressure in the Digester.

The Court therefore concludes that Debtor failed to establish that DVO breached the Digester Contract because of the high PSI levels in the Digester or that Debtor suffered damage as a result of the alleged breach. However, for the reasons set forth below in the discussion concerning the gas-mixing blower, the Court finds that the elevated pressure resulted in an

overload to the gas-mixing blower.  To the extent that that elevated pressure necessitated the replacement of the blower, it constituted a breach of the Digester Contract.

   *iv. Gas-Mixing Blower*

   Debtor argues that DVO is responsible for the cost incurred by Debtor for replacement of the gas-mixing blower.  The gas-mixing blower is part of the gas recirculation system which is listed as a "yes" item on Attachment A and, therefore, is within the scope of DVO's work as design/builder under the Digester Contract.  The gas-mixing blower constitutes materials or equipment supplied by DVO.

   The gas-mixing blower pulls gas from the biogas pipe and injects it back into the Digester to produce gas bubbles that help to mix the Digester contents.  (Tr. Vol. 3, 80:10-18.)  Philip testified that Debtor paid $4,686.31 to replace the gas-mixing blower because it caught on fire.[18] (Tr. Vol. 2, 134:14-135:1; 142:2-10.)  Chad Olsen testified that the gas-mixing blower overloaded due to the gas recirculation system running above its specifications.  (Tr. Vol. 3, 115:17-25.)  Steve Dvorak stated that blower motors can operate beyond 12 PSI and are typically designed to run up to 15 PSI.  (Tr. Vol. 4, 107:10-108:13.)  However, Dvorak did not dispute Olsen's conclusion that the gas-mixing blower had to be replaced because of high pressures in the gas recirculation system. Although there is no precise date as to when the fire occurred, Philip testified that the gas-mixing blower caught fire prior to February of 2013.  (Tr. Vol. 3, 21:10-12.)  As stated in the gas recirculation portion of the discussion, Debtor provided sufficient evidence to establish that PSI levels were over specification through February of 2013.  (DVO Ex. No. 96.)  These facts, coupled together, establish that the PSI levels were over specification at the time of the fire.  Thus, the

---

[18] Debtor attempted to place into evidence Debtor Ex. No. PL16-A, an invoice to reflect the cost to replace the gas-mixing blower.  (Tr. Vol. 2, 135:2-7.)  DVO, however, objected to its admittance on the basis that it never received the invoice during discovery, offering to the Court two sworn affidavits.  (Dkt. No. 101.)  The Court allowed Debtor to make an offer of proof but sustained DVO's objection.  (Tr. Vol. 2, 135:15-143:21.)

Court finds that Debtor established that the gas-mixing blower overloaded and had to be replaced because of elevated pressures.

DVO argues that Debtor is barred from recovering these damages, because they are outside the one-year warranty period set forth in Attachment A.[19]  (Debtor Ex. No. 1, p. 10.)  The completion date of the Digester was on January 20, 2012, which is when the warranty period began to run.  It is undisputed that Debtor did not give DVO notice of this problem with the gas-mixing blower until its Second Deductive Change Order on July 30, 2013, which is more than eighteen months after completion of the Digester.  (Debtor Ex. No. 37.)  But Debtor is not arguing that the gas-mixing blower was defective.  Rather, Debtor argues that because of the elevated pressure in the gas recirculation system, the gas-mixing blower was overloaded and caught on fire.  Thus, the Court rejects DVO's argument that Debtor is barred under the warranty provision of Attachment A from recovering damages for replacing the gas-mixing blower.

The Court finds that Debtor established that DVO breached the Digester Contract with respect to the gas recirculation system to the extent that the elevated PSI levels overstressed the gas-mixing blower, thereby causing it to catch fire.  The Court therefore awards Debtor its actual damages of $4,686.31.

<em>v.      Gas Blower for the Gen-Set Engine</em>

Debtor also seeks damages from DVO for replacement of the gas blower for the gen-set engine.  Debtor paid Martin Machinery $11,861 for the replacement of the gas blower.  (Tr. Vol. 2, 150:24-151:6.)

The gas blower compresses the gas that feeds into the gen-set engine and keeps the gas

---

[19] The warranty provides as follows:  "UNLESS OTHERWISE SPECIFIED BY EQUIPMENT OR MATERIAL MANUFACTURER, ALL EQUIPMENT AND MATERIALS PROVIDED BY [DVO] WILL BE WARRANTIED FOR A ONE-YEAR PERIOD[.]"  (Debtor Ex. No. 1, p. 10.)

flowing into the engine. (Tr. Vol. 3, 80:19-25.) Philip testified that the gas blower had to be replaced, because the previous blower, as engineered, was too small. (Tr. Vol. 2, 151:4-15.) Because the original gas blower was undersized, it did not provide enough gas to allow the gen-set engine to run at its full capacity. (Tr. Vol. 3, 108:20-109:3.)

The parties agree that DVO was originally responsible for the gas blower for the gen-set engine under the Digester Contract. However, pursuant to a change order dated May 10, 2011, the gas blower was eliminated from DVO's scope of work under the Digester Contract and the Contract price was reduced accordingly by $7,500. (DVO Ex. No. 128.) Corey Brickl confirmed this change in an email to Crowther and Philip explaining that this change was a result of Debtor choosing "to get a gas booster blower with the Martin Machinery gas skid." (DVO Ex. No. 89.) Attached to this email was a revised Build Budget that indicated that DVO was not going to supply the blower for the gen-set engine. (*Id.* at p. 2.) Brickl's testimony confirmed this change. He testified that the blower for the gen-set engine was taken out of DVO's scope of work and the price to be paid by Debtor to DVO was reduced by $7,500 to account for this change. (Tr. Vol. 5, 88:10-21; Tr. Vol. 3, 248:23-249:3.) Debtor's post-trial brief is silent with respect to this modification.

The Court finds the testimony of Brickl regarding the removal of the gas blower for the gen-set engine from DVO's scope of work to be credible, uncontroverted, and supported by the documentary evidence. Thus, Debtor is not entitled to recover damages of $11,861 from DVO for replacement of the gas blower.

vi.    *H₂S Reduction System*

$H_2S$ is hydrogen sulfide, a gas produced in the anaerobic digestion process. (Tr. Vol. 3, 81:1-10.) $H_2S$ needs to be removed from biogas before it goes into the gen-set,because it is corrosive and will destroy the engine. (*Id.* at 81:11-17.) Some of the commonly used methods for

reducing $H_2S$ in anaerobic digester systems include an iron sponge system, a biological treatment system, or an air injection system. (*Id.* at 83:4-9.)

Steve Dvorak testified that the bids obtained for the $H_2S$ reduction system were very expensive, and Debtor did not have the money to spend on an expensive system. (Tr. Vol. 4, 171:17-25.) He stated that he was developing an $H_2S$ reduction system that he wanted to patent, and he offered to let Debtor try it on a trial basis without charge. (*Id.* at 171:17-172:21.) Dvorak also stated that he wanted to avoid spending more money on the Project. (*Id.* at 176:14-20.) He offered to Debtor that if the $H_2S$ reduction system brought the hydrogen sulfide levels below 800 parts per million,[20] then DVO and Debtor would settle on a price for the $H_2S$ reduction system that DVO was supplying. (*Id.* at 172:1-10.) If the $H_2S$ reduction system had worked, DVO would have charged Debtor $30,000. (Tr. Vol. 5, 115:1-10.) DVO's $H_2S$ reduction system was an air injection system, which pumps air into the Vessel to provide oxygen to promote bacteria that converts hydrogen sulfide to elemental sulfur. (Tr. Vol. 3, 86:14-24; 99:1-5.)

Debtor contends that in order to maintain a one-year warranty on the engine from Martin Machinery, it was required to keep the hydrogen sulfide levels under 800 ppm. (Tr. Vol. 2, 7:18-8:6; 60:11-13.) Dvorak admitted that the $H_2S$ reduction system did not reduce the hydrogen sulfide levels below 800 ppm. (Tr. Vol. 5, 115:22-116:7.) Less than a week after the engine was started up, Brickl directed DVO to shut down the $H_2S$ reduction system. (Tr. Vol. 3, 229:12-231:11; Tr. Vol. 5, 7:23-8:23.)

Because the DVO-designed $H_2S$ reduction system did not reduce the hydrogen sulfide levels below 800 ppm and was shut down, Debtor was required to take corrective action. Debtor replaced DVO's $H_2S$ reduction system with a biological scrubber, designed by Martin Machinery,

---

[20] $H_2S$ is measured by "parts per million" ("ppm"), a concentration measurement. (Tr. Vol. 3, 96:17-23.)

at a cost of $153,048.50.[21]  (Debtor Ex. No. PL2-L; Tr. Vol. 2, 74:20-75:15.)  As an interim

solution, Debtor then purchased and installed an iron sponge system at a cost of $15,353.[22]  (Debtor

Ex. No. PL21-A; Tr. Vol. 2, 72:4-14.)

The biological scrubber has ongoing maintenance costs, because it uses nutrients that

Debtor must purchase.  (Tr. Vol. 2, 76:22-77:5; Tr. Vol. 3, 22:7-10; 85:20-86:2.)  The ongoing

maintenance costs for the biological scrubber are approximately $67 per day, or $24,271 per year.

(Tr. Vol. 2, 77:6-18; Debtor Ex. No. 37, Line Item No. 3.)

The $H_2S$ reduction system is marked as a "no" item for DVO on Attachment A to the

Digester Contract, indicating that DVO is not responsible for this system.  (Debtor Ex. No. 1, p.

10.)  Nonetheless, Debtor argues that DVO is still responsible for this system because it designed,

engineered, installed, and started up the original $H_2S$ reduction system, and also acknowledged its

responsibility for the system when it submitted a November 22, 2011 schematic diagram of the

Digester system showing the $H_2S$ reduction system as "[DVO] Responsibility."  (Debtor Ex. No.

12.)

The Court rejects this argument.  Attachment A to the Digester Contract unambiguously

indicates that DVO is not responsible for the $H_2S$ reduction system.  Nor has Debtor established

by a preponderance of the evidence that DVO agreed to amend the Digester Contract to assume

responsibility for the H2S reduction system.  Dvorak's explanation that DVO agreed to provide

the $H_2S$ reduction system on a trial basis does not establish that DVO agreed to assume

responsibility for the H2S reduction system.  If the system had worked as expected, then Debtor

---

[21] A biological scrubber system uses bacteria to remove hydrogen sulfide by pumping biogas through a vessel with media in it that allows the growth of bacteria, which oxidize sulfur.  (Tr. Vol. 3, 84:15-85:1.)  As biogas goes through this system, the bacteria remove the hydrogen sulfide from the biogas and oxidize it.  (*Id.* at 85:2-11.)

[22] An iron sponge system is a system in which the biogas is sent through a vessel or tank containing media that are woodchips impregnated with iron, and as the $H_2S$ flows through the woodchips, the iron attaches to the $H_2S$, taking it out of the biogas.  (Tr. Vol. 3, 83:10-18.)

would have been charged $30,000. The schematic diagram appears to be consistent with the agreement between the parties that DVO would install the $H_2S$ reduction system on a trial basis and would be paid for by Debtor only if it worked. However, because the DVO-designed system did not work, DVO did not charge Debtor for that system, and the trial use of the DVO system was therefore stopped. Debtor's request for twenty years of maintenance costs for the replacement $H_2S$ reduction system installed by Debtor is not supported by the evidence.

Debtor's final argument is that DVO should be held responsible for the $H_2S$ reduction system, because it was included as part of "Engineering/Start-up" in the Build Budget and "[n]obody ever told Philip that the $H_2S$ reduction system was excluded from [DVO's] responsibility." (Debtor Proposed Findings & Conclusions, ¶ 451; *see also* Tr. Vol. 2, 66:2-5.) This argument is rejected. Contrary to Debtor's assertion, the Build Budget does not contradict the list in Attachment A to the Digester Contract clearly indicating that the $H_2S$ reduction system was not the responsibility of DVO. In addition, it is simply not true that DVO never told Debtor that DVO was not responsible for installing the $H_2S$ reduction system – Attachment A did exactly that. But in any event, even if it were true that Philip had not been told that DVO was not responsible for the $H_2S$ reduction system, that double negative would not establish the positive that DVO was responsible. In short, the Digester Contract governs, and the language of Attachment A to that Contract unequivocally indicates that DVO was not responsible for providing the $H_2S$ reduction system.

For the foregoing reasons, the Court finds that Debtor failed to show that it is entitled to damages from DVO for costs associated with the iron sponge and the biological scrubber system.

    vii.  *Temporary Boilers*

Debtor argues that DVO breached the Digester Contract by improperly supervising

construction of the Vessel, and as a result, frost permeated the soil underneath the Vessel and

caused the Vessel wall to heave and bow. Debtor incurred charges in the amount of $17,700 from

Lincoln Contractors for temporary boilers to warm the concrete.

During the concrete pouring of the Vessel, the Vessel remained uncovered in temperatures

below zero degrees, which allowed moisture underneath the slab to freeze. (Tr. Vol. 2, 103:24-

104:25.) As a result of the frost, the Vessel floor heaved and bowed in the middle, which caused

the outer walls of the Vessel to bow out. (*Id.* at 104:17-25.) Because the walls bowed from the

frost, the top of the Vessel could not be put on. (*Id.* at 105:10-18.)

DVO employee Adam Nackers brought in ground-thawing equipment from Lincoln

Contractors to the site to try to fix the heaving issue. (*Id.* at 105:19-106:6; Tr. Vol. 4, 326:17-

327:2; Debtor Ex. No. PL9-B.) Lincoln Contractors issued an invoice for $17,700 for the ground

thawing equipment, and Debtor paid that invoice. (Tr. Vol. 2, 106:11-107:7; Debtor Ex. No. PL9-

A.)

Under the Digester Contract, construction of the Vessel was not part of DVO's work.[23]

The Digester Contract, however, provides that the:

> Design/Builder shall supervise, inspect and direct the Construction competently
> and efficiently, devoting such attention thereto and applying such skills and
> expertise as may be necessary to provide the Construction in accordance with the
> Contract Documents. Design/Builder shall be solely responsible for the means,
> methods, techniques, sequences and procedures of Construction. Design/Builder
> shall be responsible to see that the completed Construction complies accurately
> with the Contract Documents and shall keep Owner advised as to the quality and
> progress of the Construction.

(Debtor Ex. No. 2, p. 15 (Section 6.02(A)).) The Court construes this provision as requiring DVO

to "competently" maintain construction on site and prevent any damage of construction, regardless

---

[23] DVO's "work" is described in section 1.01 of the SFOA. (Debtor Ex. No. 1, p. 3.)

of whether it is was part of DVO's work during the Digester construction process.

DVO is the design/builder and is subject to section 6.02(A) of the General Conditions. Because DVO failed to cover the slab of the Vessel during the concrete pouring, as required by their responsibility to "competently" supervise construction, the Court finds that DVO breached its supervision responsibilities under section 6.02(A).

Debtor submitted the amount of $17,700 for "Lincoln Contractors Supply [invoice] 57177101" dated "2/18/2011" as an eligible cost for reimbursement under its Section 1603 Grant application and was reimbursed thirty percent of that amount ($5,310) from the federal government, leaving an "owner cost" of $12,390. (DVO Ex. No. 80, p. 8.)[24] "'[I]t goes without saying that the courts can and should preclude double recovery by an individual.'" *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 158 (Wis. 2005) (quoting *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002)). Thus, Debtor will not be allowed to recover the full cost of $17,700.

The Court finds that DVO breached the Digester Contract when it failed to competently supervise construction of the Vessel by allowing it to be left uncovered during freezing temperatures. As a result, the Court finds that DVO is liable for damages in the amount of $12,390.

   *viii. Grading Errors*

Debtor contends that DVO breached the Digester Contract in connection with both the engineering and the construction of the reception pit and other structures that are dependent upon being sited at proper elevations. Debtor seeks $89,387.40 in damages for three invoices it paid to J. Jadin Inc. (owned by Jerome Jadin) for excavation and grading services.

DVO argues that it is not responsible for these excavation and grading costs, because excavation services are marked as a "no" item on Attachment A to the Digester Contract. (Debtor

---

[24] See discussion regarding the Section 1603 Grant program on page 8 *supra*.

Ex. No. 1, p. 10.) "Excavation (only for [D]igester)" was listed on the Build Budget at an estimated cost of $45,000 and was excluded from the costs for which DVO was responsible. (*Id.* at p. 9.) The Court finds that the Digester Contract is unambiguous that DVO is not responsible for the cost of excavation. Debtor argues that "[n]onetheless, it is clear that the site grading is within the scope of [DVO's] responsibilities." (Debtor Proposed Findings & Conclusions, ¶ 527.)

The evidence established that when excavation began for the Vessel, the contractors hit groundwater at a shallower depth than anticipated. (Tr. Vol. 2, 81:24-82:7.) That caused the parties' original grading estimates to have to be revised. (*Id.* at 84:5-23.)

Following this incident, DVO decided to raise both the gen-set building and the reception pit, so that floor drains in the gen-set building could flow by gravity to the reception pit. (Tr. Vol. 3, 102:17-18; 102:22-103:3; 290:16-18; Tr. Vol. 2, 83:16-25.) On July 5, 2011, Brickl met with Dvorak and Schmidt to discuss raising the building foundation. (Tr. Vol. 3, 233:18-234:21; 236:5-14; Debtor Ex. No. PL4-B.) Philip and Crowther were not part of that meeting. (*Id.*)

Raising the Vessel resulted in additional grading and excavation costs above and beyond the $45,000 estimate in the Build Budget. Those additional costs totaled between $140,000 and $150,000. (Tr. Vol. 2, 84:5-23.)

Debtor asserts that DVO is responsible for three invoices it paid J. Jadin for excavation related to hitting the water table as well as excavation related to the Vessel construction. The invoices are dated November 30, 2010, December 28, 2010, and March 4, 2011 and seek payment of $52,756.10, $1,476.03, and $35,155.27, respectively for a total of $89,387.40. (Debtor Ex. No. PL4-A.)

Debtor argues that this additional grading, which relates to excavation, was DVO's responsibility, because the site plans required "[DVO] TO VERIFY THAT PUMPS, PIPE

DIAMETERS, ELEVATIONS, SLOPES . . . MEET THE DETAILED DESIGN REQUIREMENTS OF THE DIGESTER SYSTEM." (Debtor Ex. No. PL5-C.)   Philip testified that this language showed that DVO was therefore responsible for the cost of making sure that all of the elevations on the Project met the design requirements. (Tr. Vol. 2, 89:4-11; 92:13-94:5.)

The Court has reviewed the site plans. While the language on the site plans relied on by Debtor provides that DVO is responsible for verifying that the elevations meet the design requirements, it does not address who will bear the costs for excavation/grading. By contrast, Attachment A to the Digester Contract plainly indicates that the costs for excavation services are not the responsibility of DVO. Similarly, the Build Budget provides that the estimated excavation cost of $45,000 will not be the responsibility of DVO. Thus, the Court finds that under the Digester Contract, DVO was not responsible for the cost of excavation/grading.

This conclusion is buttressed by an admission Crowther made in an email he sent to Nathan Hacker at D&D on September 21, 2011, requesting D&D to begin installing the piping in order to clean up the grading. In that email, Crowther admitted that "[w]e understand the costs [of the piping] are to us." (DVO Ex. No. 195.)

Debtor finally argues that DVO's failure to submit a change order for the additional expenses associated with raising the gen-set building made it responsible for the additional excavation and grading costs. (Tr. Vol. 3, 104:11-22; 292:4-6.) But in making this argument, Debtor fails to cite to any provision of the Digester Contract that required DVO to submit a change order. Debtor's failure to cite to a specific provision of the Digester Contract is fatal. It is not the job of the Court to sift through the record to find evidence to support Debtor's claim. *See Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006). Thus, the Court rejects Debtor's argument regarding

the change order.[25]

Debtor has therefore failed to prove that DVO was responsible for the excavation/grading costs under the Digester Contract or that it should be held liable for those costs on some basis. Accordingly, the Court finds that Debtor is not entitled to recover $89,387.40 from DVO for costs related to excavation/grading.

### ix.    Propane/Heat for Startup

Debtor seeks damages from DVO for costs associated with the use of propane in order to heat the Vessel during construction in the winter of 2010-2011, and to heat the manure as the Vessel was being filled during the winter of 2011-2012.

Using propane gas to heat the Vessel was necessary during construction in the winter of 2010-11. (Tr. Vol. 2, 111:20-112:8; 117:15-18; Tr. Vol. 3, 122:18-23.) In addition, using propane gas to heat the manure in the Digester in January 2012 was necessary when the Digester first started operating. (Tr. Vol. 2, 113:9-16; Tr. Vol. 5, 10:9-15.) Philip and Olsen both testified that Debtor incurred costs of $69,836.50 for the use of propane during this time. (Tr. Vol. 2, 117:15-18; Tr. Vol. 3, 122:24-123:14.) Philip testified that the invoices from Lakes Gas Company for these costs are contained in Debtor Ex. No. 12-A. (Tr. Vol. 2, 117:15-18.)

The Digester Contract clearly provides that DVO, as the design/builder, was required under section 6.04(A) of the General Conditions to provide, among other things, "fuel, power, light, heat, . . . and all other facilities and incidentals necessary for the Work." (Debtor Ex. No. 2, p. 11.) "Work" in section 1.01 of the SFOA includes "Anaerobic digester engineering, construction and

---

[25] In its post-trial brief, Debtor cites the testimony of its expert witness who stated that the lack of a change order by DVO constituted poor administration or project management. (Debtor Proposed Findings & Conclusions, ¶ 381; Tr. Vol. 3, 104:23-25.) However, the opinion of Debtor's expert witness regarding DVO's administration or project management skills has no bearing on its argument that DVO is responsible for the excavation/grading costs under the Digester Contract. To prevail on such a claim, Debtor must establish that the Digester Contract was breached and that damages resulted from that breach. The expert witness's criticism of DVO's project management or administration does not support Debtor's claim that DVO breached the Digester Contract.

installation of the digester heating system, gas mixing system, and building interior plumbing and electrical work, digester startup, and project management and administration (see Attachment A)." (Debtor Ex. No. 1, p. 3.) Section 1.01(47) of the General Conditions defines the "Work" as the "entire construction or the various separately identifiable parts thereof required to be performed or furnished under the Contract Documents. Work includes and is the result of performing or furnishing Design Professional Services and Construction required by the Contract Documents." (Debtor Ex. No. 2, p. 2.)

Based on the Digester Contract language, the Court finds that DVO was required to provide fuel and heat necessary for the construction of the Digester during the winter of 2010-11 as well as for the startup of the Digester in January 2012. DVO's failure to pay for the propane constitutes a breach of the Digester Contract. Because propane was necessary during construction and at the time of startup, and because DVO was obligated under the Digester Contract to provide that fuel, the Court finds that Debtor is entitled to damages for the amount it paid for this expense.

DVO points to an email sent by Crowther to Nackers on November 14, 2011, wherein he states that "[w]e will make arrangements for the propane" as evidence that DVO is not responsible for this cost. (DVO Ex. No. 197.) The Court rejects this argument. The mere fact that Debtor agreed to arrange for the delivery of the propane does not release DVO from its responsibility to pay for these costs under the Digester Contract.

DVO does not dispute that Debtor in fact used the amount of propane which it says that it did. Rather, it argues that because Debtor was reimbursed thirty percent of its propane expenses by the federal government under the Section 1603 Grant, any awarded damages should be reduced accordingly. The Court agrees. Debtor submitted a total of $69,836.49 in Lakes Gas Company invoices as an eligible cost for reimbursement under the Treasury Grant and was reimbursed thirty

percent of that sum, which amounted to $20,950.94. (DVO Ex. No. 80, pp. 8-9.) Thus, because

Debtor was reimbursed $20,950.94 its "owner-cost" is $48,885.55.

The Court finds that DVO is liable for damages for breach of section 6.04(A) of the

Digester Contract in the amount of $48,885.55 and awards these damages to Debtor.

      x.    *Added Ventilation to the Engine Room*

Debtor argues that DVO should be held responsible for the costs associated with ventilation

for the gen-set building. Debtor was invoiced $31,180 by Schaus Roofing & Mechanical

Contractors ("Schaus"), the company that installed the ventilation equipment in the gen-set

building. (Tr. Vol. 2, 122:14-123:4; Debtor Ex. No. PL13-A.)

Nackers testified that the work performed by DVO in the gen-set building consisted of

helping to obtain a bid for the ventilation equipment and providing information for the layout of

the openings of the cutouts in the walls where the fans or louvers would be installed. (Tr. Vol. 4,

272:7-14; 279:6-10.) DVO's work was limited to the layouts of the wall openings. (*Id.* at 272:7-

17.) Nackers testified that DVO was not responsible for providing the ventilation equipment in

the gen-set building and explained that ventilation was taken care of by an outside contractor. (*Id.*

at 273:6-16.) As evidenced by an email sent by Crowther to Nackers on February 1, 2012, Debtor

hired Schaus to construct and install the ventilation in the gen-set building. (DVO Ex. No. 184.)

Attachment A to the Digester Contract listed certain items related to construction of the

gen-set building as being the responsibility of DVO and others as being the responsibility of

Debtor. (Debtor Ex. No. 1, p. 10.) Ventilation was not included on that list as a responsibility of

either party. (*Id.*) Thus, the Court cannot conclude based on Attachment A who had the

responsibility for the ventilation equipment.

Debtor argues that DVO's "work on the building" falls within the Engineering/Start-Up or

Administrative/Project Management categories under the Build Budget. (Debtor Proposed Findings & Conclusions, ¶ 390.) However, Debtor has not stated its basis for the claim that the cost of ventilation for the gen-set building would fall under either of these categories. Debtor simply relies on the testimony of Philip who stated that he was "surprised" that ventilation was not included in DVO's plans for the gen-set building, because it was necessary to keep an ambient temperature in the building and every farm he had visited had ventilation. (Tr. Vol. 2, 123:5-14.) Standing alone, this testimony is insufficient to demonstrate by a preponderance of the evidence that ventilation for the gen-set building would come under the Engineering/Start-up or Administrative/Project Management categories.

By contrast, Brickl provided detailed testimony regarding DVO's responsibilities under the Engineering/Start-Up and Administrative/Project Management categories. The cost of $185,000 in the Administrative/Project Management category was a fixed fee that DVO charged on its projects. (Tr. Vol. 5, 63:7-22.) He stated that the services provided in this category included administration of the grant, project administration and management directly related to DVO's scope of work, interaction with the owners, suppliers, vendors, and contractors, and DVO's soft overhead costs. (*Id.*) Steve Dvorak testified that because DVO's scope of work included the heating and gas mixing systems, the responsibilities under the project management and administration included engineering, delivering, and installing those systems. (Tr. Vol. 4, 258:15-23.)

According to Brickl, the Engineering/Start-Up category cost of $320,000 is a standard fee charged by DVO for all of its digester projects and is based on the overall cost of the Digester and a percentage of the Digester system. (*See* Tr. Vol. 3, 255:6-16.) This figure included the Vessel, the design of the heating and mixing systems, the design of the biogas system, and the design of

the biogas collection system. (Tr. Vol. 5, 61:24-62:7.)

Brickl's testimony established that the Engineering/Start-Up category concerned design work performed by DVO, and the Administrative/Project Management category concerned general administration and project management related to the Digester. The cost for the ventilation work performed by Schaus would not fall within these categories. Thus, the Court finds that this cost was not included as DVO's responsibility under the Engineering/Start-Up or Administrative/Project Management categories in the Build Budget.

Accordingly, the Court finds that Debtor is not entitled to recover $31,180 from DVO for the costs associated with ventilation for the gen-set building.

xi.    *Endeavor Electric Invoice*

Debtor seeks damages of $56,931 for the costs it incurred to Endeavor Electric. According to Philip, Endeavor Electric sued Debtor and obtained a judgment for $56,000. (Tr. Vol. 2, 126:11-19.)

Nackers testified that Endeavor Electric was an electrical subcontractor of DVO for work associated with the Digester heating and gas mixing systems. (Tr. Vol. 5, 10:23-11:1.) The scope of the work for which Endeavor Electric was engaged by DVO consisted of wiring any components related to the heating and mixing systems and the controls for those systems. (*Id.* at 23:1-5.)

Nacker's testimony regarding the scope of Endeavor Electric's engagement is consistent with the allocation of costs between DVO and Debtor in the Build Budget. That document excluded the estimated "Electrical" cost of $78,500 under the "Building" category from the costs for which DVO was responsible. (Debtor Ex. No. 1, p. 9.)

According to Nackers, Endeavor Electric performed other tasks at the direction of Debtor that were outside of the scope of work that it was contracted to perform for DVO. (Tr. Vol. 5,

21:13-23:17.) This consisted of working on other portions of the Digester and biomass facility, including the manure transfer wiring, general building wiring, wiring for the fans and ventilation, and a variety of other things. (*Id.* at 23:6-14.) Philip similarly testified that Debtor asked Endeavor Electric to perform work on small projects that were separate and apart from the design of the Digester. (Tr. Vol. 2, 124:1-125:2.)

Nackers testified that he did not direct Endeavor Electric to perform any work on the wiring of the building. (Tr. Vol. 5, 27:3-15.) While some of the invoices from Endeavor Electric mention that electrical work was performed "as directed by Adam Nackers," the only work that he directed pertained to DVO's heating and mixing systems and the wiring of those systems, and did not include the wiring of the building. (*Id.*) Nackers emphasized that he did not direct Endeavor Electric to perform any work relating to the wiring of the building. (*Id.* at 28:4-11.)

Debtor seeks to recover $56,931 from DVO, but it has not clearly articulated the work performed by Endeavor Electric to which these costs relate. In its post-trial brief, Debtor asserts that "Endeavor [Electric] ultimately sent invoices in the amount of $56,931 to [Debtor]. Those invoices were originally issued to DVO for work 'directed by Adam Nackers.'" (Debtor Proposed Findings & Conclusions, ¶ 534.) The invoices submitted to the Court by Debtor in Exhibit Nos. PL15-A and PL15-B do not total $56,931. However, invoice #4345, which was billed to SVP for "[w]ire manure equipment at S&S AG. . . ." is in the amount of $56,931. (Debtor Ex. No. PL15-A, p. 4.) That invoice does not indicate at whose direction the work was performed. (*Id.*) Based on the fact that the amount of this single invoice exactly matches the amount being sought by Debtor for this category, it appears that the damages sought by Debtor relate to this single invoice. It is unclear to the Court why Debtor elicited testimony regarding numerous other invoices, some of which were billed to SVP and others billed to DVO. Moreover, the majority of invoices that

were directed to SVP—with the exception of invoice #4345 for $56,931—indicated that the work was performed at the direction of either Philip or Crowther, not Nackers. (Debtor Ex. No. PL15-B.) Therefore, the costs that Debtor seeks to recover relate to a single invoice, and that invoice did not indicate at whose direction the work was performed. Nor did Debtor elicit testimony from any witness regarding the nature of the work performed by Endeavor Electric relating to this invoice. However, the Court finds that the work described in invoice #4345 as "wire manure equipment" is consistent with the work performed by Endeavor Electric at Debtor's request. The Court finds that that work was outside the scope of the work for which it was retained by DVO, as outlined in Nacker's testimony.

In addition, on April 12, 2012, Joel Justinger, the president of Endeavor Electric, sent a letter to Crowther stating that he was enclosing invoices that "are for wiring of the building, and installation of the electrical services at the [Farm]." (Debtor Ex. No. PL15-A, p. 1.) Included in this correspondence was invoice #4345 for $56,931 for "wire manure equipment." This document further corroborates Nacker's testimony that Debtor directly requested Endeavor Electric to perform building wiring work and that Endeavor Electric was not engaged by DVO to perform such work.

Debtor argues that DVO should be held responsible for the $56,931 because Endeavor Electric was DVO's subcontractor and because Debtor did not have a contract with Endeavor Electric. This argument lacks merit. Both Nackers and Philip testified that it was Debtor, not DVO, who asked Endeavor Electric to perform work. Thus, there is no dispute that even if Debtor had no written contract with Endeavor Electric, Endeavor Electric appeared to have performed some work at the oral request of Debtor, and Debtor has not explained adequately why it should not be liable for the costs associated with that work. Debtor has not demonstrated how Endeavor

Electric's status as a subcontractor of DVO has any bearing on whether Debtor would be liable for work performed by Endeavor Electric at the request of Debtor.

Debtor also argues that it already paid DVO for building electrical work. Therefore, it should not be required to pay for this work directly to Endeavor Electric. This argument is entirely unsupported by the evidence. DVO does not dispute that it received payment from Debtor related to electrical work. Instead, DVO argues that the costs which Debtor seeks to recover relate to building wire work that was performed at Debtor's request rather than electrical work associated with the Digester heating and gas mixing systems for which DVO was responsible.

Accordingly, the Court finds that Debtor failed to prove that DVO was responsible for the costs of $56,931 incurred by Debtor to Endeavor Electric.

<em>xii.    Conestoga-Rovers & Associates Invoice</em>

Debtor seeks $18,186.43 in damages from DVO with respect to work performed by Conestoga-Rovers & Associates ("CRA"). CRA acted as a civil engineer for the Project and was the company that drew the various site plans for the Project. (Tr. Vol. 2, 90:3-5; 205:25-206:4.) Debtor paid invoices issued by CRA totaling $18,186.43.[26] (*Id.* at 89:25-92:9; Debtor Ex. No. PL5-A.)

Debtor argues that it did not have a written contract with CRA. (Tr. Vol. 2, 90:6-7.) DVO also claims not to have had a contract with CRA and argues that it was Debtor who contracted directly with CRA for the creation of site plans. (DVO Proposed Findings & Conclusions, p. 47.) The contemporaneous documents which are available are the CRA invoices, all of which were billed by CRA to Debtor, not DVO, and all of which Debtor paid. (Debtor Ex. No. PL5-A.)

Debtor argues that DVO is responsible for the CRA charges because: (1) Dvorak stamped

---

[26] The Court notes that the invoices total $18,186.83, not $18,186.43.

the CRA plans and (2) Nackers testified that DVO was involved in the elevation for the manure transfer system. DVO relies on an email sent by Nackers on December 6, 2010, indicating that "CRA and [DVO] are in the process of designing the manure transfer system at [the Farm]." (Debtor Ex. No. PL6-D.) Debtor has failed to show how any of these facts demonstrate that DVO is responsible under the Digester Contract for the CRA charges.

Accordingly, the Court finds that Debtor is not entitled to recover $18,186.43 in damages from DVO for the CRA charges.

### E.    Defenses of Waiver and Estoppel

DVO argues that Debtor waived any right to seek recovery for the following costs under the doctrines of waiver and estoppel: (1) gas-mixing blower; (2) $H_2S$ reduction system; (3) temporary boilers; (4) grading; (5) propane/heat for startup; (6) ventilation for the engine room; (7) Endeavor Electric invoice; and (8) CRA invoice. According to DVO, Debtor contracted for, directed, and received the benefit of the work/materials and paid the invoices for the work/materials without protest with respect to all of these costs.

DVO has failed to provide any support for these arguments. "[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) (internal quotation omitted); *Arlin-Golf, LLC v. Vill. of Arlington Heights*, 631 F.3d 818, 822 (7th Cir. 2011) (stating that because the party "cited no relevant legal authority to the district court to support the proposition . . . , the argument is waived"). Thus, the Court rejects DVO's defenses of waiver and estoppel.

### F.    DVO's Setoff Defense

DVO argues that it is owed $465,829.94 by Debtor for the work it performed on the Project. DVO states in its post-trial brief that it asserted a setoff claim in a counterclaim to Debtor's

complaint.

Wisconsin law recognizes that a party may assert setoff as a defense. *Sylvester v. Martin (In re Martin)*, 130 B.R. 930, 939 (Bankr. N.D. Ill. 1991). Although the Bankruptcy Code does not create a federal right of setoff, 11 U.S.C. § 553 preserves a creditor's right to offset a mutual debt owed by the creditor to the debtor.

The Court has reviewed DVO's answer to the complaint and notes that the answer is entirely devoid of any reference to setoff or offset. (Dkt. No. 35, Ex. X.) Page 4 of the answer contains a heading entitled "Counterclaim," which consists of three paragraphs that merely identify Debtor and DVO. (*Id.*) Thus, DVO has failed to properly assert the defense of setoff. In addition, DVO failed to offer any evidence at the trial that would establish that it is owed a debt by Debtor and the amount of that debt.

For these reasons, the Court rejects DVO's setoff defense.

## G.    Attorneys' Fees

Debtor asserts that it is entitled to its attorneys' fees, expert witness fees, and costs as a result of DVO's defective construction and breach of the Digester Contract under sections 12.06, 12.07, and 12.09 of the General Conditions. (Debtor Proposed Findings & Conclusions, pp. 122-23; *see also* Debtor Ex. No. 2, pp. 26-27.)

On February 21, 2017, DVO filed a motion seeking to bar Debtor's Ex. No. PL19-A, which was a list of attorneys' fees incurred by Debtor without a description of the work performed that was associated with those fees. (Dkt. No. 102.) Debtor filed a response to that motion on February 27, 2017. (Dkt. No. 110.) On March 8, 2017, the Court granted DVO's motion and barred Debtor from using its Ex. No. PL19-A at trial without prejudice to Debtor's right to seek attorneys' fees, if appropriate, at a later time. (Dkt. No. 124.) Because the Court concludes that DVO breached

the Digester Contract and is liable to Debtor for damages, the issue of whether DVO must reimburse Debtor for its attorneys' fees and costs is now ripe.

Accordingly, the Court will allow Debtor to file a brief seeking recovery of its attorneys' fees and costs. Debtor must submit the itemized fees and costs as well as provide the legal support for the award of such fees and costs. That brief shall be filed by September 7, 2017. DVO is given leave to file a response by September 21, 2017. Debtor shall file its reply by September 28, 2017. A status hearing is set for October 17, 2017 at 10:00 a.m.

## V.    CONCLUSION

For the reasons stated above, the Court finds that DVO breached the Digester Contract and is liable to Debtor for damages as follows: (1) $4,686.31 for the gas-mixing blower; (2) $12,390 for the temporary boilers; and (3) $48,885.55 for propane heat during startup. Accordingly, the Court finds that Debtor is entitled to damages from DVO in the amount of $65,961.86.

The briefing schedule on Debtor's request for attorneys' fees and costs is as follows: Debtor shall file its brief by September 7, 2017; DVO is given leave to file a response by September 21, 2017; and Debtor shall file its reply by September 28, 2017. A status hearing is set for October 17, 2017 at 10:00 a.m.

DATE: **August 18, 2017**                    ENTERED:

_____
**Donald R. Cassling
United States Bankruptcy Judge**